# WESTERN PACIFIC RAILROAD CO. ET AL. *v.* UNITED STATES ET AL.

No. 12. Argued October 19, 1965.—Decided December 7, 1965.

*Paul Bender, pro hac vice,* by special leave of Court, and *Walter G. Treanor* argued the cause for appellants. With *Mr. Bender* on the brief for the United States were *Acting Solicitor General Spritzer, Assistant Attorney General Turner, Lionel Kestenbaum, Jerry Z. Pruzansky*

and *John H. Dougherty*. With *Mr. Treanor* on the briefs for Western Pacific Railroad Co. et al. were *E. L. Van Dellen* and *E. Barrett Prettyman, Jr.*

*Robert W. Ginnane* argued the cause for appellee Interstate Commerce Commission. With him on the brief was *Robert S. Burk*. *Frank S. Farrell* argued the cause for appellees Northern Pacific Railway Co. et al. With him on the brief were *William P. Higgins, Charles W. Burkett* and *Earl F. Requa*.

Mr. Justice Stewart delivered the opinion of the Court.

Section 3 (4) of the Interstate Commerce Act, as amended, 54 Stat. 902, 49 U. S. C. § 3 (4) (1964 ed.), commands that "All carriers subject to the provisions of this chapter . . . shall not discriminate in their rates, fares, and charges between connecting lines . . . ."[1] The meaning of the term "connecting lines" is the crucial question in this controversy between the Western Pacific Railroad Company, on the one hand, and the Union Pacific Railroad Company and the Northern Pacific Railway Company, on the other. Western Pacific contends that it is a "connecting line" in relation to these carriers and that, therefore, it is entitled to invoke against them the provisions of § 3 (4) prohibiting dis-

---

[1] Section 3 (4) provides in full:

"All carriers subject to the provisions of this chapter shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines, and for the receiving, forwarding, and delivering of passengers or property to and from connecting lines; and shall not discriminate in their rates, fares, and charges between connecting lines, or unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper. As used in this paragraph the term 'connecting line' means the connecting line of any carrier subject to the provisions of this chapter or any common carrier by water subject to chapter 12 of this title."

criminatory rates. The Interstate Commerce Commission and the District Court held otherwise.

Western Pacific filed a complaint with the Commission, alleging, in part, that Union Pacific and Northern Pacific practice rate discrimination against it.[2] The alleged discrimination consists in the refusal of these carriers, except with respect to a few commodities, to enter into joint through rates via Portland, Oregon, with the route of which Western Pacific is part, although they maintain a full line of such rates with a competitor, the Southern Pacific Company. The hearing examiner found in favor of Western Pacific, but Division 2 of the Commission reversed. The Division found both that Western Pacific could not invoke the provisions of § 3 (4) because it was not a "connecting line," and that, even if it were, the evidence did not establish the "similarity of circumstances and conditions" that would compel rate treatment equal to that accorded to Southern Pacific.

---

[2] Western Pacific and its subsidiaries named as defendants: The Northern Pacific Railway Company, The Union Pacific Railroad Company, and certain of their short-line connections. These railroads denied the allegations of the complaint. The Southern Pacific Company intervened in opposition to the complaint. The complaint also named as defendants: The Atchison, Topeka & Santa Fe Railway Company, The Great Northern Railway Company, and certain short-line connections. These railroads answered expressing willingness to join in the relief sought by Western Pacific.

The complaint also alleged violation of § 1 (4) of the Act which requires, in part, that railroads establish "reasonable through routes" with other carriers and "just and reasonable rates, fares, charges, and classifications applicable thereto . . . ." When such routes are not established voluntarily, the Commission has authority under § 15 (3), to prescribe them "in the public interest." This authority is subject to the short-haul limitation embodied in § 15 (4). Although the complainants indicated a willingness to rely solely on the alleged violation of § 3 (4), the Commission found against them on the § 1 (4) allegation as well. No question under § 1 (4) is presented here.

The Division refused to accord Western Pacific "connecting line" status on the ground that it neither physically connects with the allegedly discriminating carriers at the point of discrimination, nor participates in existing through routes with them through that point. *Western Pacific R. Co.* v. *Camas Prairie R. Co.*, 316 I. C. C. 795. When the full Commission denied further hearing, Western Pacific brought this action in the United States District Court for the Northern District of California to set aside the Commission's order. The three-judge court dismissed the complaint solely on the ground that Western Pacific was not a "connecting line." *Western Pacific R. Co.* v. *United States*, 230 F. Supp. 852. It agreed with the Commission's limited definition of the term and said, "Any further liberalization of the present definition will have to come from the Supreme Court." *Id.*, at 855. We noted probable jurisdiction. 379 U. S. 956.

Analysis of "connecting line" status in this case is closely tied to the geographical, structural, and economic relationships among the railroads involved. Union Pacific, Northern Pacific and their short-line connections provide exclusive rail service between many points in the Pacific Northwest and Portland, Oregon. From Portland, the two competitive routes in question descend, at times parallel, at times intertwined, to Southern California. The route closest to the seacoast consists largely of Southern Pacific. To the east of this route lies the so-called Bieber route whose completion in 1931 was authorized by the Commission to provide competition with Southern Pacific.[3] The Bieber route is composed of the end-to-end connections of three different companies: the Great Northern Railway from Portland to

___

[3] *Great Northern R. Co. Construction*, 166 I. C. C. 3, 39; 170 I. C. C. 399.

Bieber, California; the Western Pacific from Bieber to Stockton; and the Atchison, Topeka & Santa Fe from Stockton to Southern California. Thus the Bieber route and Southern Pacific both connect with the allegedly discriminating carriers at Portland where facilities for the interchange of traffic exist.

The Bieber route carriers presently enjoy joint through rates among themselves. Moreover, the other two participants in that route have expressed willingness to join with Western Pacific in the joint rates it seeks with Union Pacific and Northern Pacific. Union Pacific and Northern Pacific, for over 50 years, have maintained through routes and a full line of joint rates with Southern Pacific via Portland. They have refused, however, except for a few commodities, to offer through routes and joint rates on traffic moving on the Bieber route through Portland. The joint rates established with Southern Pacific are lower than the combination of local rates that would otherwise apply. Since the Bieber route carriers can offer joint rates only with respect to a few commodities, they cannot match the lower rates offered by Southern Pacific to shippers of most commodities between points in California and points in the Pacific Northwest exclusively served by Union Pacific and Northern Pacific via Portland.

The Commission and the District Court held, however, that even under these circumstances, Western Pacific is not a "connecting line" eligible to complain of the alleged discrimination. In argument here the Commission and the appellee railroads contend that to qualify for that status Western Pacific must show more than that it participates in an established through route that connects with Union Pacific and Northern Pacific, and that all the participants in the route stand willing to cooperate with these carriers in establishing joint through

rates.[4] We are urged to hold that to qualify under § 3 (4) as a complainant "connecting line" a railroad must either itself make a direct connection with the discriminating carrier, or be part of a through route that already includes the carrier. We cannot accept such a construction of the statute.

The literal meaning of the statute does not require that construction. To be sure, the term, "connecting lines" suggests the requirement of an actual physical connection between the complainant and the discriminating carrier. The term "line," however, admits of more than a single meaning limited to the track owned exclusively by one railroad company. It may also be interpreted reasonably to include a functional railroad unit such as the Bieber through route involved here. Moreover, all parties in this litigation recognize that in *Atlantic Coast Line R. Co.* v. *United States,* 284 U. S. 288, this Court rejected the contention that "connecting line" is a term limited to the meaning that the statutory language might initially suggest. Mr. Justice Brandeis, speaking for a unanimous Court, wrote, "There is no warrant for limiting the meaning of 'connecting lines' to those having a direct physical connection . . . . The term is commonly used as referring to all the lines making up a through route." *Id.,* at 293.

There also is no warrant for limiting the meaning of "connecting lines" to the lines making up a through route that already includes the discriminating carrier. We have been referred to no previous judicial or administrative decisions compelling that conclusion. The *Atlantic Coast Line* case, *supra,* imposes no such limitation. It established that the term "connecting lines"

---

[4] Pursuant to 28 U. S. C. § 2322 (1964 ed.), the United States was named as defendant in the District Court. It did not, however, join with the Commission in defense of the Commission's order, and it supports Western Pacific in this Court.

extends beyond physical connection to encompass lines participating in a through route, but it does not even hint of any limitation on the nature of the through route, much less hold that the through route must already include the discriminating carrier.[5]   Our subsequent definition of "through route" in *Thompson* v. *United States,* 343 U. S. 549, adds no more to an analysis of "connecting line" under § 3 (4).   In that case, which arose under §§ 15 (3) and 15 (4) of the Act, we held that the Commission had improperly applied the test of the existence of a through route: ". . . whether the participating carriers hold themselves out as offering through transportation service."   343 U. S., at 557.   Section 3 (4) does not use the term "through route."   But even if, after *Atlantic Coast Line,* a carrier may qualify as a "connecting line" if it is one of the "lines making up a through route,"

---

[5] In the *Atlantic Coast Line* case, certain railroads leasing the Carolina, Clinchfield & Ohio Railway with the approval of the Commission filed restrictive schedules designed ultimately to exclude an as yet incomplete extension of the Georgia & Florida Railroad from participating, when completed, in joint rates over the Clinchfield. The Commission ordered the schedules canceled on the ground that they violated terms in the lease, accepted by the lessees, on which the Commission had conditioned its approval.   One condition required the lessees to permit the Clinchfield to be used as a link for through traffic with "such other carriers, now connecting, or which may hereafter connect, with [it] . . . ."   284 U. S., at 292, note 3. The extension of the Georgia & Florida made connection with the Clinchfield only via the rails of an intermediate carrier.   This Court sustained the Commission's order, however, and held that the Georgia & Florida was a carrier connecting with the Clinchfield because it was one of the "lines making up a through route."   284 U. S., at 293.   Even assuming that the through route referred to was not one limited to the complaining carrier and the intermediate carrier, it is clear that this Court was not faced with the question whether the complaining railroad would be regarded as a "connecting line" if the through route establishing the connection did not also encompass the Clinchfield.   In short, *Atlantic Coast Line* did not present the issue squarely before us now.

284 U. S., at 293, the *Thompson* test offers no solution to the problem presented here. It simply does not speak to the question whether the discriminating carrier must be one of the participating carriers offering through service in conjunction with the carrier seeking "connecting line" status.

The reason the issue presented in this case has not been decided before now [6] may be that discrimination of the sort complained of here is uncommon. In most instances it is to the advantage of railroads such as Union Pacific and Northern Pacific to encourage the movement of traffic over their lines from as many sources as possible.[7] Moreover, when such discrimination does occur the railroad connecting directly with the discriminating carrier is likely to take the lead as complainant.

In the absence of any settled construction of § 3 (4), then, its manifest purpose to deprive railroads of discretion to apportion economic advantage among competitors at a common interchange must be the basic guide to decision. Just such discretion would be conferred upon railroads in a position to discriminate if we were to hold that their decisions not to enter through route relationships with connecting through routes could bar nonadjacent participants in such through routes from eligibility to complain. Indeed such a holding would result in an anomalous set of circumstances clearly illustrated in the present context. No one doubts that Southern Pacific, by virtue of its direct physical con-

---

[6] Although we do not regard *Chicago, Indianapolis & Louisville R. Co.* v. *United States,* 270 U. S. 287, as dispositive of the question presented, that case, on its facts, supports the conclusion we reach.

[7] In response to an inquiry at oral argument, the parties have submitted memoranda agreeing that through routes and joint rates are ordinarily established by voluntary agreement, and that a railroad usually interchanges traffic on a comparable basis with competing railroads at a common interchange. See also *Thompson* v. *United States,* 343 U. S. 549, 554.

nection, would be eligible to complain of rate discrimination if it were practiced in favor of the Bieber route. It is also undisputed that Great Northern would be eligible to complain of the present discrimination, not merely as it affects its segment of the Bieber route, but on behalf of the route as a whole. Moreover, it is clear that if Union Pacific and Northern Pacific had entered a through route relationship with the Bieber route and then had decided to abandon it, or to set rates somewhat higher than those set for Southern Pacific, any participant in the Bieber route could complain of that discrimination. We cannot therefore construe § 3 (4) to bar these participants from eligibility to complain solely because they have been put to an even greater competitive disadvantage by the refusal of the allegedly discriminating carriers to enter a through route relationship with them comparable to the one established with Southern Pacific. Hence, we hold that to qualify as a "connecting line," in the absence of physical connection, a carrier need only show that it participates in an established through route, making connection at the point of common interchange, all of whose participants stand willing to cooperate in the arrangements necessary to eliminate the alleged discrimination.

Such a construction of "connecting line" does not interfere with the function of the Commission under § 15 (3) of the Act, 54 Stat. 911, 49 U. S. C. § 15 (3) (1964 ed.), to require the establishment of through routes and joint rates "in the public interest."[8] Sec-

---

[8] Section 15 (3) provides in relevant part:

"The Commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest, after full hearing upon complaint or upon its own initiative without complaint, establish through routes, joint classifications, and joint rates, fares, or charges, applicable to the transportation of passengers or property by carriers subject to this chapter . . . or the maxima or minima, or maxima and minima, to be charged, and the divisions of such rates, fares, or charges as hereinafter provided, and the terms and conditions under which such through routes shall be operated."

tion 3 (4) is applicable only to a narrower range of situations involving discrimination at a common interchange. Moreover, the remedy in § 3 (4) situations need not entail the establishment of through routes, joint rates, or indeed any particular form of relief. All that is required is the elimination of discriminatory treatment. See *Chicago, Indianapolis & Louisville R. Co.* v. *United States,* 270 U. S. 287, 292–293; *United States* v. *Illinois Central R. Co.,* 263 U. S. 515, 520–521. Finally, our holding does no more than to define the characteristics of a carrier eligible to complain. Relief is warranted only if it also appears that differential treatment is not justified by differences in operating conditions that substantially affect the allegedly discriminating carrier. See *United States* v. *Illinois Central R. Co., supra,* at p. 521; *Atchison, Topeka & Santa Fe R. Co.* v. *United States,* 218 F. Supp. 359, 369.

In the present case, having found that Western Pacific was not eligible to complain, the District Court did not reach the question whether it was entitled to relief. We therefore vacate the judgment and remand this case to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Douglas, dissenting.

Under the Interstate Commerce Act, 49 U. S. C. § 1 *et seq.,* as I read it, there are two ways of obtaining "through routes." One is to qualify as a "connecting line" within the meaning of § 3 (4) where a similarly situated competing carrier has been given a through route.[1]

---

[1] Section 3 (4) provides:

"All carriers subject to the provisions of this chapter shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and *connecting lines,* and for the receiving, forwarding, and delivering

The other is to apply for a rate for a "through route" under § 1 (4).[2] In the event that a carrier refuses to establish a "through route," the Commission may "upon complaint or upon its own initiative without complaint," establish a "through route" when "deemed by it to be necessary or desirable in the public interest." § 15 (3).[3]

In this case appellants sought a "through route" with certain appellee railroads on the same basis as the joint rates those railroads had established with the Southern

---

of passengers or property to and from *connecting lines;* and shall not discriminate in their rates, fares, and charges between *connecting lines,* or unduly prejudice *any connecting line* in the distribution of traffic that is not specifically routed by the shipper. As used in this paragraph the term 'connecting line' means the connecting line of any carrier subject to the provisions of this chapter or any common carrier by water subject to chapter 12 of this title." (Italics added.)

The discriminatory refusal to enter into through routes has been held to constitute a violation of § 3 (4). See *Dixie Carriers, Inc.* v. *United States,* 351 U. S. 56.

[2] Section 1 (4) provides in part:

"It shall be the duty of every common carrier subject to this chapter to provide and furnish transportation upon reasonable request therefor, and to establish reasonable through routes with other such carriers, and just and reasonable rates, fares, charges, and classifications applicable thereto; . . ."

[3] Section 15 (3) provides in part:

"The Commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest, after full hearing upon complaint or upon its own initiative without complaint, establish through routes, joint classifications, and joint rates, fares, or charges, applicable to the transportation of passengers or property by carriers subject to this chapter, or by carriers by railroad subject to this chapter and common carriers by water subject to chapter 12 of this title, or the maxima or minima, or maxima and minima, to be charged, and the divisions of such rates, fares, or charges as hereinafter provided, and the terms and conditions under which such through routes shall be operated."

Pacific. In an adversary proceeding the Commission denied the establishment of a "through route" under § 1 (4) saying:

". . . The shippers urge that the rates and routes sought would give them more freedom of choice in the movement of their goods, would improve transportation service, time in transit, and car supply, and make available additional transit privileges. Nothing of record, however, indicates that the existing through routes and joint rates are inadequate to meet the needs of the shipping public. In fact the failure of the shipper witnesses to initiate in the last 31 years a determined campaign to persuade the defendants of the necessity of establishing through routes between points on the complainants' lines in California and points on the defendants' lines in the Northwest, is at least some indication of the adequacy of the existing routes. The expression 'in the public interest' means more than a mere desire on the part of shippers for something that would merely be convenient or desirable for them. This desire must be weighed against the effect on other carriers and the general public. On the basis of this record, we cannot find that the public interest would be served by requiring the establishment of joint rates and through routes which are substantially slower and costlier than the present routes." 316 I. C. C. 795, 810–811.

What the Court does today is to let § 3 (4) swallow § 1 (4) by letting any segment of a multi-carrier through route become a "connecting line." [4] For then the ban

---

[4] The term "multi-carrier through route" is used here to indicate a route composed of two or more carriers which have established among themselves a through route with joint rates. This, of

in § 3 (4) on discriminatory rates *in effect* forces the establishment of "through routes" with "just and reasonable rates" as required by § 1 (4), without satisfying any of the conditions of § 1 (4) and of § 15 (3). Indeed after today, the whole protective scheme of § 15 (3) which makes the Commission the guardian of "through routes" (see *St. Louis R. Co.* v. *United States,* 245 U. S. 136, 142–143) breaks down.

In addition to the conditions set forth in § 15 (3) the Commission's power to compel the establishment of through routes is limited by § 15 (4), which prevents the Commission from establishing any through route requiring a carrier to "short haul" itself except where particular circumstances (enumerated in § 15 (4)) are found to exist. See *Thompson* v. *United States,* 343 U. S. 549, 552–556; *Denver & R. G. W. R. Co.* v. *Union P. R. Co.,* 351 U. S. 321, 325 *et seq.; Chicago, M., St. P. & P. R. Co.* v. *United States,* 366 U. S. 745. Can a carrier after today's decision be compelled to "short haul" itself where an internal segment of a multi-carrier through route invokes § 3 (4)? [5]

Section 3 (4) narrowly construed to include only lines that physically abut, would, of course, lift some cases from § 1 (4) and from § 15. But those are the exceptions, relatively few in number. The Court multiplies those almost without end when it holds that any interior segment of an established multi-carrier through route is a "connecting line" within the meaning of § 3 (4).

Today's decision uproots the established concept of "through routes." As we stated in *Thompson* v. *United*

---

course, describes the Bieber route from southern California to Portland.

[5] Congress has refused, although requested to do so by the Commission, to repeal § 15 (4). See *Thompson* v. *United States, supra,* at 555.

*States,* 343 U. S. 549, 557 (quoting from the Commission's 21st Annual Report to Congress):

"A through route is a continuous line of railway formed by an arrangement, express or implied, between connecting carriers. . . . Existence of a through route is to be determined by the incidents and circumstances of the shipment, such as the billing, the transfer from one carrier to another, the collection and division of transportation charges, or the use of a proportional rate to or from junction points or basing points. These incidents named are not to be regarded as exclusive of others which may tend to establish a carrier's course of business with respect to through shipments."

Then we added:

"In short, the test of the existence of a 'through route' is *whether the participating carriers hold themselves out as offering through transportation service. Through carriage implies the existence of a through route whatever the form of the rates charged for the through service." Ibid.* (Italics added.)

And see *Denver & R. G. W. R. Co.* v. *Union P. R. Co.,* 351 U. S. 321, 327, 330.

Here there has been no "holding out" by the participating carriers (either consensually or as a result of any Commission action) that offers this interior segment of this multi-carrier route to become a part of any "through route." If we are to allow § 1 (4) and §§ 3 (4) and 15 (3) to exist in harmony, we must adhere to that requirement, restricting "connecting line" to those lines that have a direct physical connection with the allegedly discriminating carrier.

*Atlantic Coast Line R. Co.* v. *United States,* 284 U. S. 288, is not opposed. While the line in question was only a segment in a multi-carrier system, it had "through

routes" with the other carriers in controversy. *Id.*, at 292. The words "connecting lines" [6] were therefore used to include "all the lines making up a through route." *Id.*, at 293. But there is no "through route" here, the defendants not having agreed to one and the Commission having expressly disallowed one pursuant to its power under § 15 (3).

---

[6] Section 3 (4) was not involved. What was in litigation was the construction of one of its earlier orders allowing one carrier to lease another. Commission approval was accompanied by conditions assuring "equal service, routing, and movement of competitive traffic to and from all connecting lines" reached by the lessee. 284 U. S., at 292. It was in that context that the Court held that carriers were protected even though their rails did not "physically abut" on the rails of the lessee. 284 U. S., at 293.