600 F.2d 349
 STATE OF NEW YORK, Petitioner,
and
S & E Shipping Corp. and Seafarers International Union of
North America, AFL-CIO, Intervenors,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
and
Pennsylvania Public Utilities Commission, Consolidated Rail
Corporation, Soo Line Railroad Company and
ConAgra, Incorporated, Intervenors.
 No. 32, Docket 78-4036.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 17, 1978.
Decided May 7, 1979.
 
 Patrick McEligot, Washington, D.C. (Bryce Rea, Jr. and Leo C. Franey, Washington, D.C., of counsel), for petitioner.
 
 
 1
 Robert J. Ables, Washington, D.C. (Walter C. Wallace, Washington, D.C., of counsel), for intervening petitioner, S & E Shipping Corp.
 
 
 2
 David Jaffe, New York City (Schulman, Abarbanel & Schlesinger, New York City, Howard Schulman, of counsel), for intervening petitioner, Seafarers International Union of North America, AFL-CIO.
 
 
 3
 L. Marie Guillory, Atty., I.C.C., Washington, D.C. (John H. Shenefield, John J. Powers, III, Robert Wiggers, Mark L. Evans and Henri F. Rush, I.C.C., Washington, D.C., of counsel), for respondents, Interstate Commerce Commission and United States.
 
 
 4
 C. Harold Peterson, Minneapolis, Minn., for intervening respondent, Soo Line R. Co.
 
 
 5
 Peter A. Greene, Washington, D.C. (Caldwell & Greene, Washington, D.C., of counsel), for intervening respondent, ConAgra, Inc.
 
 
 6
 John A. Daily, Philadelphia, Pa. (Robert M. Peet, New York City, of counsel), for intervening respondent, Consolidated Rail Corp.
 
 
 7
 Kathleen H. Larkin, Chief Counsel, Pennsylvania Public Utility Commission, Harrisburg, Pa. (Alfred N. Lowenstein, Harrisburg, Pa., of counsel), for intervening respondent, Pennsylvania Public Utility Commission.
 
 
 8
 Before MOORE, TIMBERS and VAN GRAAFEILAND, Circuit Judges.
 
 VAN GRAAFEILAND, Circuit Judge:
 
 9
 The State of New York seeks review of a 1978 order of the Interstate Commerce Commission[1] discontinuing its investigation of certain train rates alleged to discriminate against Great Lakes grain carriers in violation of 49 U.S.C. § 3(4).[2] In 1977, we reversed a prior Commission order which had held that the allegedly injured lake carriers were not protected by section 3(4) and remanded for the Commission to determine whether discrimination did in fact exist. State of New York v. United States, 568 F.2d 887 (2d Cir. 1977). The Commission has now found that the proposed rates are not discriminatory, and the matter is once again before us for review. The facts were discussed in our prior opinion and will be referred to herein only so far as is necessary to frame the issues.
 
 
 10
 The City of Buffalo is the flour milling center of the eastern United States. Grain is hauled into Buffalo from the midwest by rail, truck, and ship, stored there in elevators, and then distributed throughout the eastern states. Since 1964, much of the rail traffic into Buffalo has been by unit-train movements originating on the Soo, Burlington Northern, or Chicago & Northwestern and connecting at Chicago with either the Erie, Norfolk & Western, or Penn Central.
 
 
 11
 A unit-train consists of fifty or more cars, made up, transported, and delivered as a unit. Intertrain and intratrain switching are eliminated. The cars move under a single "gang" waybill. They are returned as a single intact group to the original point of shipment. Clerical work for routing and billing is minimal. Unit-train service permits better utilization of cars, and locomotive and crew needs can be planned with some predictability. It is an efficient and economical method of handling bulk shipments. However, it is not available for movements eastward from Buffalo to places such as Martins Creek, Pennsylvania.
 
 
 12
 For the first year after ConAgra opened its flour mill at Martins Creek in March 1973, it received its grain from Buffalo mills. That portion which had been delivered to Buffalo by rail had come over 1100 miles from Twin Ports or Twin Cities at a unit-train rate of 43 cents per 100 pounds. The 340-mile rail movement from Buffalo to Martins Creek was at a five-car rate of 40 cents per 100 pounds. Obviously, the latter rate was higher per mile than the former. The rate eastward from Buffalo was the same, however, regardless of whether the grain movement into Buffalo from the west was by ship, rail, or truck. Clearly, no carrier from the west could claim that it was being discriminated against because of the higher Buffalo to Martins Creek rate.
 
 
 13
 In September 1973, Soo and Erie published rates for unit-train movements from Twin Ports and Twin Cities, bypassing Buffalo and going directly to Martins Creek. The tariff, which became effective on June 1, 1974, called for open navigation season unit-train rates of 72.25 cents per 100 pounds and closed navigation season unit-train rates of 88 cents per 100 pounds. Petitioner contends that these rates, although more expensive per mile than the unit-train rates into Buffalo and more expensive overall than the lake-rail rates to Martins Creek, discriminated against lake carriers transporting grain into Buffalo.[3] The Commission disagrees.
 
 
 14
 Congress has committed to the Commission "the determination, by application of an informed judgment to existing facts, of the existence of forbidden preferences, advantages and discrimination." United States v. Chicago Heights Trucking Co., 310 U.S. 344, 352-53, 60 S.Ct. 931, 936, 84 L.Ed. 1243 (1940). Our review of the Commission's determination is limited in nature; we may not set it aside if it was within the Commission's statutory power to make and is supported by substantial evidence. United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 534-36, 66 S.Ct. 687, 90 L.Ed. 821 (1946); 5 U.S.C. § 706. Evidence may be substantial without being weighted in favor of the Commission's holding. Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). If it would justify a trial court in refusing to direct a verdict, it will withstand judicial scrutiny on review of the Commission's order. Illinois Central Railroad Co. v. Norfolk & Western Railway Co., 385 U.S. 57, 66, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966). We think the evidence in the instant case satisfies these requirements.
 
 
 15
 Chicago, where ConRail's haul originates, is a common point of interchange for both lake and rail traffic. It is a large grain market with extensive storage facilities and elevators capable of loading unit-trains of fifty or more cars. ConRail may move unit-trains of grain from that connecting point directly to Martins Creek without going near the City of Buffalo. On the other hand, it may detour 200 miles into Buffalo, a second lake and rail connecting point, and go from there to Martins Creek. (See map in our prior opinion, 568 F.2d at 891).
 
 
 16
 On the first hearing before the Commission, the protestants challenged the proposed unit-train rates from Twin Ports and Twin Cities because similar unit-train rates were not made available to elevators in Chicago. Their contention that this unavailability violated sections 4(1) and 3(1) of the Act was rejected by the Commission. Following remand, however, the Commission held that operating conditions attending ex-rail and ex-lake movements of grain from Chicago to Martins Creek would be substantially similar and that it would be a violation of section 3(4) if ConRail refused to participate in joint rates and through routes with lake carriers at Chicago on the same basis as it did with the Soo Railroad. ConRail has indicated its willingness to do so. However, no request for such service has yet been made by any lake carrier.
 
 
 17
 In summary, then, the record shows ConRail moving grain between Chicago and Martins Creek, with two possible points of interchange with lake traffic, Chicago and Buffalo. At Chicago, ConRail is prepared to enter into equal rate arrangements with all connecting carriers. At Buffalo, all connecting carriers are already treated the same.
 
 
 18
 The Interstate Commerce Act's prohibition against discrimination requires that all should be treated the same under the same or similar circumstances. Pittsburgh & W. V. Ry. Co. v. United States, 41 F.2d 806, 810 (N.D.Ohio 1929), Aff'd, 281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980 (1930). Put another way, "(s) ection 3(4) requires equality of treatment between connecting lines but equality of treatment involves comparable conditions . . . ." Atlantic Coast Line Railroad Co. v. United States, 205 F.Supp. 360, 365 (M.D.Ga.), Aff'd, 371 U.S. 6, 83 S.Ct. 42, 9 L.Ed.2d 49 (1962) (per curiam). With respect to lake traffic, the yardstick for measuring discrimination is "the compensation received by the outbound rail carrier on ex-rail traffic from the same port to the same destination." Arrow Transportation Co. v. United States, 176 F.Supp. 411, 419 (N.D.Ala.1959), Aff'd, 361 U.S. 353, 80 S.Ct. 406, 4 L.Ed.2d 362 (1960). The Commission was satisfied in this case that, where comparable conditions between lake and rail carriers existed, equal rate treatment was available and that, accordingly, there was no violation of section 3(4).[4]
 
 
 19
 The Commission found that it would be inefficient and uneconomical for ConRail to institute unit-train service between Buffalo and Martins Creek that would be comparable to its unit-train service from Chicago. The Chicago unit-train rate is applicable to shipments consisting of at least three consecutive unit-trains of at least fifty cars each. ConAgra is the only shipper capable of receiving grain in such quantities at Martins Creek, the destination to which the proposed tariff applies. The Commission found that a "chaotic" traffic situation existed at the Buffalo terminal causing inordinate traffic congestion and delay on shipments to Martins Creek.[5] This, plus the lack of elevator and storage facilities at Buffalo capable of accommodating three consecutive fifty-car trainloads of grain, would prevent ConAgra from securing the constant flow of grain inventory necessary for efficient and competitive milling. The existence of such "operating deficiency", the Commission found, justifies a disparity in rates as between the connecting lines at Buffalo and those at Chicago.
 
 
 20
 ConAgra has not requested the installation of unit-train service between Buffalo and Martins Creek. Significantly, neither has petitioner nor any lake carrier. Petitioner simply requests this Court to order the cancellation of the unit-train rates from Twin Ports and Twin Cities to Martins Creek because the Buffalo to Martins Creek rates are proportionately higher and more profitable. However, there was substantial evidence to support the Commission's finding that unit-train service was more efficient and economical than movement in single or five-car lots[6] but that normal utilization of unit-train service was not available on the Buffalo to Martins Creek haul. This determination is properly entrusted to the enlightened judgment of the Commission. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 54 S.Ct. 692, 78 L.Ed. 1260 (1934). Our judicial function is exhausted if there is a rational basis in the evidence to support the Commission's conclusion. Consolidated Carriers Corp. v. United States, 321 F.Supp. 1098, 1100 (S.D.N.Y.1970), Aff'd, 402 U.S. 901, 91 S.Ct. 1375, 28 L.Ed.2d 642 (1971).
 
 
 21
 Upon remand, the Commission properly received additional evidence as to the effect of the disputed tariffs. Rush v. Gardner, 273 F.Supp. 753, 755 (N.D.Ga.1967). This showed that, between 1973 and 1976, annual shipments of wheat to Buffalo by lake carrier increased by over 16.5 million tons, or approximately fifty percent. It disclosed also that, despite the adoption of the challenged unit-train rates, about fifty percent of ConAgra's wheat requirements are still transported by lake carrier and seventy percent of all grain movements from Buffalo to Martins Creek are by truck. This evidence gives little support to petitioner's claim of discrimination.
 
 
 22
 The petition for review is denied, and the Commission's order of January 18, 1978, is affirmed.
 
 TIMBERS, Circuit Judge, dissenting:
 
 23
 More than two years ago, this Court remanded this case to the ICC "for the limited purpose of determining whether the proposed rates discriminate against the lake carriers as connecting lines." State of New York v. United States, 568 F.2d 887, 897 (2 Cir. 1977).[1] Our remand was a narrow one which called for a specific determination on a precise issue. As the author of our earlier opinion remanding the case to the ICC, it is crystal clear to me that the Commission on remand either has misconstrued our mandate or has ignored it. 356 I.C.C. 82 (1978). I therefore dissent from today's majority opinion which denies the petition to review and affirms the Commission's order of January 18, 1978.
 
 
 24
 The crux of the Commission's error is that, rather than making a determination of the discrimination issue on the basis of Existing actual conditions On the Buffalo-Martins Creek run (which was the clear import of our remand), it has come up with a decision based on a Hypothetical new unit-train service (which is totally beyond the scope of our mandate). In short, the Commission simply has not made the determination required by our mandate.
 
 
 25
 It is undisputed on the record before us that a rate differential, unjustified by cost differences, has been shown. The Commission so found. 356 I.C.C. at 92. The precise issue therefore is whether the railroads can justify charging twice as much to transport wheat over a rail route that connects with a water carrier than over the competing rail route that connects with another railroad, despite the fact that the rail revenue yield on the water-rail route is substantially higher than the yield on the competing rail route.
 
 
 26
 Under these circumstances, the rule of Western Pacific Railroad Co. v. United States, 382 U.S. 237 (1965), becomes applicable, namely, that relief to eliminate discriminatory rate treatment which is prohibited by § 3(4) of the Interstate Commerce Act, 49 U.S.C. § 3(4) (1976), is warranted if "that differential treatment is not justified by differences in operating conditions that substantially affect the allegedly discriminating carrier." Id. at 246. In short, the burden is on the railroads here to justify the differential on the basis of different operating conditions on the two routes referred to above, see Seatrain Lines, Inc. v. United States, 233 F.Supp. 199, 209 (D.N.J.1964) (three-judge court), by showing that it would be unfair or unjust to require equal treatment by the allegedly discriminating carrier. Western Pacific Railroad Company v. United States, 263 F.Supp. 140, 145 (N.D.Cal.1966) (three-judge court, on remand from Supreme Court). See I.C.C. v. Mechling, 330 U.S. 567, 581 (1947).[2]
 
 
 27
 While the Commission on remand purported to give lip-service to the Supreme Court's holding in Western Pacific Railroad Co., supra, 356 I.C.C. at 92, its decision to permit the railroads to maintain a rail rate structure which discriminates against water carriers at Buffalo is grounded upon the following one-sentence finding:
 
 
 28
 "In our view the evidence is convincing that the Establishment of a new unit-train service over Buffalo would be inefficient, uneconomical, and counterproductive and that the existence of such operating deficiencies justify the disparity in rates or divisions as between the connecting lines." 356 I.C.C. at 92. (emphasis added).
 
 
 29
 Such a finding, based not on Existing actual conditions, but on a Hypothetical new unit-train service, most assuredly does not comply with our mandate. And I fail to see any support for it in the Supreme Court's test set forth in Western Pacific Railroad Co., supra.
 
 
 30
 The railroads, in my view, have totally failed to justify the undisputed rate discrimination which has been found, permitting ConRail to earn roughly twice as much, After expenses, from its Buffalo-Martins Creek route as from its Chicago-Martins Creek route. See Majority Opinion at 351 n. 3.
 
 
 31
 In many respects the instant case is analogous to Seatrain Lines, Inc. v. United States, supra. There it was claimed that operating disadvantages on the water-linked rail route justified clearly discriminatory rates. The three-judge district court, after holding that the Commission's finding of no discrimination under § 3(4) was in error, remanded the case to the ICC. The ICC here has failed even to make a finding pursuant to our remand, relying instead on a hypothetical proposed new unit-train service.
 
 
 32
 I can appreciate the desire of my colleagues to draw down the curtain on this prolonged litigation. It has involved three Commission decisions and two petitions to review in this Court. Our prior decision of two years ago reversed and remanded the two prior Commission decisions. Nevertheless, I do not believe that we can let the Commission's latest decision stand without unleashing endless mischief from a precedent standpoint.
 
 
 33
 Since the Commission's findings demonstrate that the discriminatory rail rates are not justified and are unlawful under § 3(4) of the Act, I believe that a further remand to the Commission would be an exercise in futility. I therefore would direct the Commission to enter an order (within a reasonable period of time to allow any aggrieved party to seek Supreme Court review) cancelling the rates under investigation in this docket which have created the unlawful discriminatory rate structure. This may seem like strong medicine. But strong medicine is precisely what should be prescribed to remedy the flagrant violation of § 3(4) of the Interstate Commerce Act disclosed by the undisputed record before us.[3]
 
 
 
 [1]
 Unit Train Rates on Wheat, Minn. & Wis. to Martin's Creek, Pa., 356 I.C.C. 82 (1978)
 
 
 [2]
 So far as pertinent, § 3(4) prohibits carriers from discriminating in their rates, fares, and charges between connecting lines
 
 
 [3]
 Petitioner bases its argument upon a comparison of the new rates with the Buffalo to Martins Creek rate. For Erie's 910-mile leg from Chicago to Martins Creek, the open navigation season rate under the new tariff provided revenue of .0516 cents per mile. The 340-mile haul from Buffalo to Martins Creek provided Erie with revenue of .1176 cents per mile. These rates have been increased since 1974, but the relationship between them remains substantially the same. The present open season rate of 94.5 cents gives ConRail (Erie's successor) .0675 cents per mile revenue on its haul from Chicago to Martins Creek; and an increased rate of 47 cents per 100 pounds from Buffalo to Martins Creek gives ConRail .1382 cents per mile revenue on that haul. ConRail's net revenue over both variable and fully allocated costs is higher on the Buffalo to Martins Creek run
 
 
 [4]
 The lake carriers say they have no desire to go to Chicago; that they prefer to go to Buffalo. By the same token, ConRail could argue that, insofar as Martins Creek's shipments are concerned, it preferred to go to Chicago rather than to Buffalo
 
 
 [5]
 The Commission found that the elapsed time between the arrival of cars at Buffalo for loading and the arrival at Martins Creek for unloading was as much as 24 days, or three to four times as long as for the haul from Twin Ports to Martins Creek
 
 
 [6]
 In addition to the customary economies incident to unit-train movements, the tariff requirement of three consecutive movements eliminates the cost of assembly and breakup of trains after each movement. Moreover, in this instance, the cars involved are furnished by the Soo, thus effecting a substantial additional saving for ConRail
 
 
 [1]
 Our prior opinion was rendered by Judges Anderson and Timbers. The third member of the panel, Judge Hays, who heard the arguments, was not able to participate further because of temporary illness. Judge Anderson died after our remand and prior to the instant appeal
 Our order remanding the case to the ICC to determine whether the proposed rates discriminate against the lake carriers as connecting lines followed our holding (1) that the Commission had erred in its interpretation of § 3(4) of the Interstate Commerce Act in finding that the lake carriers were not entitled to protection under § 3(4), and (2) that the lake carriers were not "connecting lines" within the meaning of the statute. 568 F.2d at 894-97.
 
 
 [2]
 Perhaps some clue to the error into which I think the majority has fallen in the instant case is its failure to consider the controlling Supreme Court cases of Western Pacific Railroad Co., supra, and Mechling, supra; nor does the majority refer in any way to the closely analogous three-judge court cases of Seatrain Lines, supra, and Western Pacific Railroad Co., supra (on remand)
 
 
 [3]
 Despite my disagreement with the majority's essential holding which denies the petition to review and affirms the Commission's order of January 18, 1978, I do agree with the majority's holding in the following respects:
 (1) It was proper for the ICC to make part of the record on remand the supplemental statements of the parties. Rush v. Gardner, 273 F.Supp. 753, 755 (N.D.Ga.1967) (three-judge court). As a practical matter, agency efforts on remand to keep the factual record fresh should not be discouraged.
 (2) There was no error in the ICC's determination to include a Chicago rate in its decision after remand. That rate, however, does not cure whatever discrimination may exist at Buffalo. The purpose of § 3(4) was to prevent railroads from exercising discretion in serving connecting carriers. That is exactly what offering the equivalent rate to grain carried by lake shippers but at Chicago only would allow ConRail to do.
 (3) That intervenor S & E Shipping falls within the protective umbrella of § 3(4), even though we differ over how much protection the umbrella affords in the instant case.