**PROVIDENCE AND WORCESTER RAILROAD COMPANY, Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

**Penn Central Corporation, et al., Intervenors.**

No. 80–1772.

United States Court of Appeals, First Circuit.

Argued Sept. 10, 1981.

Decided Dec. 24, 1981.

As Modified Jan. 27, 1982.

Thomas E. Acey, Jr., Washington, D.C., with whom John L. Richardson, Lloyd John Osborn, and Verner, Liipfert, Bernhard & McPherson, Washington, D.C., were on brief, for petitioner.

Kathleen V. Gunning, Atty., I.C.C., Washington, D.C., with whom William F. Baxter, Asst. Atty. Gen., John J. Powers, III, Kenneth P. Kolson, Attys., Dept. of Justice, Richard A. Allen, Gen. Counsel, and Henri F. Rush, Associate Gen. Counsel, Washington, D.C., were on brief, for I.C.C. and the United States.

Sidney Weinberg, Boston, Mass., for Boston and Maine Corp., debtor.

Laurence Z. Shiekman, Philadelphia, Pa., with whom Pamela L. Perry, Joan A. Yue, and Pepper, Hamilton & Scheetz, Philadelphia, Pa., were on brief, for Consolidated Rail Corporation.

James E. Howard, Philadelphia, Pa., for Penn Central Corporation.

Before ALDRICH, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Providence and Worcester Railroad ("P&W") petitions for review of a decision by the Interstate Commerce Commission ("ICC") dismissing its complaint against the Boston and Maine Railroad ("B&M"),[1] Consolidated Rail Corporation ("Conrail"), and the Penn Central Corporation.[2] P&W alleged that the defendants, individually and in concert, diverted rail traffic away from a "gateway"[3] in Worcester, Massachusetts, which it owns to various other gateways, in violation of the Interstate Commerce Act, 49 U.S.C. §§ 10101 et seq. ("ICA"). An administrative law judge (ALJ) held hearings and concluded that the defendants' conduct was lawful, a review board of the ICC affirmed the dismissal of P&W's com-

plaint, and further administrative review was subsequently denied. Jurisdiction of this court has been invoked pursuant to 28 U.S.C. §§ 2321, 2342. We uphold the decision of the ICC.

## I. FACTUAL BACKGROUND

The focus of this dispute is tracks within and between Worcester rail yards which belong to P&W and comprise the so-called "Worcester gateway." All traffic seeking to interchange at Worcester between B&M lines to the north and east and Conrail lines to the south and west must make use of these tracks. P&W here complains that B&M and Conrail have acted unlawfully in routing traffic to gateways in other areas where their two lines directly interconnect, thus obviating use of the third carrier's tracks.

Prior to 1968, the Worcester gateway was controlled by the New York, New Haven and Hartford Railroad ("New Haven") under a lease from P&W and the Norwich and Worcester Railroad ("N&W"). In 1968, the New Haven became part of the Penn Central Transportation Company ("PCTC"), predecessor to the Penn Central Corporation (see note 2, supra). After the 1968 merger, PCTC continued to operate track leased from N&W, which permitted a direct interchange between B&M and PCTC; it elected, however, not to continue to operate the lines leased from P&W. In an abandonment proceeding before the ICC in 1972, P&W sought and obtained permission, effective in February 1973, to operate the track formerly operated by the New Haven (which was by then part of PCTC). An arbitration award established P&W's right to participate in "overhead traffic"[4] through the gateway. Thus, from 1973 through March 31, 1976, the Worcester

---

1. The named defendants were the trustees in bankruptcy of the B&M.

2. The named defendants were the trustees in bankruptcy of the Penn Central Transportation Company, which was subsequently reorganized and renamed the Penn Central Corporation.

3. A "gateway" is an interchange where one carrier transfers its traffic to another carrier for further movement.

4. "Overhead traffic" is traffic that neither originates nor terminates on a line, but merely moves over it.

gateway was controlled partly by PCTC and partly by P&W.

On April 1, 1976, the northeast rail reorganization became effective, pursuant to the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 et seq. ("RRR Act"). The RRR Act established the Conrail system in an attempt to restructure the entire northeast rail system, which had been plagued by financial difficulties. The United States Railway Association ("USRA") administered the formation of Conrail, deciding which lines were to be included in it and which were not. P&W obtained exclusive control of the remaining 300 yards of the Worcester gateway from the USRA,[5] effective April 1, 1976, the date Conrail commenced its independent operations, which included the relevant former PCTC track to the south and west of Worcester. As of April 1, 1976, therefore, the direct B&M–PCTC interchange at Worcester was severed, and henceforth B&M traffic seeking to interchange with Conrail at Worcester was required to first interchange with P&W, which would then interchange with Conrail, producing the routing B&M–P&W–Conrail (the same was also true, of course, for Conrail traffic seeking to interchange with the B&M). B&M and Conrail began interchanging their traffic at Rotterdam Junction, New York, and Springfield and Boston, Massachusetts, where they could interchange directly without the necessity of a third carrier. The volume of traffic interchanging at Worcester fell dramatically; P&W claims that it has lost approximately $5,000 per day in overhead traffic that rightfully belonged to it. The basic issue before us is the legality of the new traffic patterns through gateways other than Worcester.

## II. THE DISCRIMINATION CLAIM

 P&W's primary contention is that the defendants' conduct violated 49 U.S.C. § 10701(c) (formerly part of ICA § 3(4)),[6] which provides that a carrier may not "unreasonably discriminate against [a connecting] line in the distribution of traffic that is not routed specifically by the shipper." This statute prohibits both discriminatory routing of unrouted traffic and the inducing of shippers to discriminate in specifying their routings. See Bangor & Aroostock Railroad v. ICC ("BAR"), 574 F.2d 1096, 1103–04 (1st Cir.), cert. denied, 439 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978); Southern Pacific Railway v. United States, 277 F.Supp. 671, 685 (D.Neb.1967) (three-judge court), aff'd mem., 390 U.S. 744, 88 S.Ct. 1442, 20 L.Ed.2d 275 (1968). P&W alleges that both types of conduct occurred here. But a carrier may prefer one line over another if the preference is justified by differences in conditions; the statute only proscribes discrimination between essentially comparable lines.[7] See Western Pacific

---

5. The defendants claim that P&W—which itself furnishes certain local service—represented to the USRA that it desired these lines only for local traffic of its own, and that it therefore cannot now assert an interest in overhead traffic moving over the lines. The ICC apparently did not agree, as it went on to consider the merits of P&W's claims. We have found nothing in the record which, absent findings and rulings by the agency, would enable a reviewing court on its own to preclude P&W's assertion of an interest in this traffic, and therefore we shall reach the merits as well. In so stating we do not mean to pass on defendants' contention in this regard.

6. Public Law No. 95–473, Oct. 17, 1978, 92 Stat. 1337, re-codified and re-enacted the ICA as subtitle IV of Title 49 of the United States Code. While the wording of certain portions of the Act was changed, Congress specified that the re-codification "may not be construed as making a substantive change in the laws replaced." Pub.L.No. 95–473, sec. 3(a).

7. P&W seems to imply, at points in its argument, that section 10701(c) embodies some sort of presumption in favor of existing traffic patterns, and that unlawful discrimination occurs whenever these patterns are changed. We are not aware of any authority for so broad a proposition, and we decline to accept it here, for two reasons. First, the large-scale rail reorganization that established Conrail might well be expected to cause major rerouting based on greater efficiencies made possible by the consolidation of formerly separate lines. Second, and more generally, section 10701(c)'s proscription of unreasonable discrimination is not intended to freeze any particular routes over time. Effective competition requires flexible responses to changing circumstances. To interpret section 10701(c) as a roadblock to such

*Railroad v. United States*, 382 U.S. 237, 246, 86 S.Ct. 338, 344, 15 L.Ed.2d 294 (1965); *State of New York v. United States*, 600 F.2d 349, 352 (2d Cir. 1979), *cert. denied*, 449 U.S. 887, 101 S.Ct. 242, 66 L.Ed.2d 113 (1980). The defendants assert, and the ICC found, that conditions at the Worcester gateway were not sufficiently similar to those at the other gateways to bring the proscriptions of the statute into play. We believe the ICC's determination is supported by substantial evidence, 5 U.S.C. § 706(2)(E), and therefore do not disturb it.

The ICC found that the Rotterdam Junction, Springfield, and Boston interchanges enjoyed numerous operating advantages over Worcester. Rotterdam Junction, in particular, is close to Conrail's classification yard in Selkirk, New York, and permits high-volume, high-speed interchanging. Springfield and Boston were also found to be more efficient than Worcester. Moreover, beginning on April 1, 1976, B&M and Conrail could not interchange directly at Worcester; the ICC supportably found that the three-carrier interchange there was less efficient than the direct two-carrier interchange that could be performed at the other gateways.[8]

The ICC found also that Conrail and B&M earned greater revenues by routing traffic through Rotterdam Junction rather than Worcester.[9] In *BAR*, where the issue was not necessary to decision, we expressly left open the question whether revenue or other non-service-related justifications could constitute defenses to a discrimination claim. 574 F.2d at 1105 n.10. Now that the question is presented, we agree with the ICC that, for section 10701(c) purposes, a carrier does not "*unreasonably* discriminate" (emphasis supplied) where legitimate revenue considerations lead it to send traffic to one connecting line rather than another. Such considerations, grounded in the operating economics of the industry, are an essential factor in making rail transportation responsive to the realities of a competitive market. Taking them into account does not contravene section 10701(c), whose purpose, like that of its predecessor statute, is "to deprive railroads of discretion to apportion economic advantage among competitors," *Western Pacific Railroad Co. v. United States*, 382 U.S. 237, 244, 86 S.Ct. 338, 343, 15 L.Ed.2d 294 (1965). Congress has determined that competition is to be preferred over regulation in the oversight of the rail industry. 49 U.S.C. § 10101a(1), (2). It has also committed to the ICC "the determination, by application of an informed judgment to existing facts, of the existence of forbidden . . . discrimination." *United States v. Chicago Heights Trucking Co.*, 310 U.S. 344, 352–53, 60 S.Ct. 931, 935–36, 84 L.Ed. 1243 (1940). The ICC's determination here is one we should not lightly overturn. It is consistent with the statute and with national rail transportation policy. Its application to the facts of this case is supported by substantial evidence. We therefore uphold the ICC on this issue.

In seeking reversal of the ICC, P&W argues various factual issues at length, contending that the ICC misjudged the weight of the evidence or was inaccurate and incorrect on some points. As to many of these matters, we can only say that it is not the function of a reviewing court to substitute for the agency. We are satisfied that the ICC's essential conclusions are substantially

---

flexibility could result in widespread inefficiencies.

8. The ICC did not rely, as P&W suggests, solely on an unsupported assumption that a two-carrier interchange is inherently more efficient than a three-carrier interchange, in the face of evidence to the contrary. *Compare Green Bay & Western Railroad v. United States*, 644 F.2d 1217 (7th Cir. 1981), relied on by P&W. Several witnesses testified that the insertion of an additional carrier downgrades service by creating delays and increasing the chances for damages, derailment and errors in classification. *See also Refrigerants or Dispersant Gases, Louisiana & Kentucky to California*, 353 I.C.C. 796, 802 (1977) (noting that additional interchanges can increase time required to traverse route).

9. B&M earned a greater revenue division, while Conrail avoided the loss of its business with B&M to the Delaware & Hudson Railway Co. *Cf. National Gypsum Co. (Huron Cement Div.) v. United States*, 353 F.Supp. 941, 947 (W.D.N. Y.1973) (three-judge court).

supported in the record, and that to the extent there may be some inaccuracies, these are too minor to undermine the soundness of the agency's decision overall. *See State of New York v. United States,* 600 F.2d 349, 351 (2d Cir. 1979).

P&W insists that even if the gateways are not comparable, the defendants' preferences for the gateways other than Worcester were motivated not by their advantages, but by the desire to eliminate the Worcester gateway, and with it, P&W. We do not think the evidence required any such determination by the ICC. The record not only indicates the existence of satisfactory reasons for what was done, but provides little to suggest the kind of "hard core" anticompetitive conduct and purpose revealed in *BAR.* No conspiratorial agreement between B&M and Conrail regarding solicitation was established, nor were there joint sales meetings or calls, nor did the defendants provide misleading or incorrect routing information or alternatives to shippers. There is evidence, moreover, that when solicitations favoring routings other than Worcester were made, defendants were aware of the deficiencies of the Worcester gateway. *Compare BAR,* 574 F.2d at 1102–03 & n.7. The ICC could reasonably conclude that the conduct here was based on service considerations and legitimate self-interest, and simply did not reflect the blatant discrimination in disregard of service and competitive considerations disapproved of in *BAR.*

We hold that there is substantial evidence to support the ICC's finding that conditions at the Worcester gateway were not sufficiently comparable to those at other gateways to make illegal the defendants' preference for those other gateways in their solicitation and distribution of traffic.

### III. THE TRAFFIC CONDITIONS CLAIM

In an argument similar to that made under section 10701(c), P&W claims that the defendants' conduct resulted in a "commercial closing" of the Worcester gateway. This is alleged to be in violation of the

traffic conditions imposed on PCTC in a 1966 merger case, *Pennsylvania Railroad— Merger—New York Central Railroad,* 327 I.C.C. 475 (1966), and in the 1972 abandonment proceeding wherein P&W obtained possession of the line formerly leased to the New Haven, ICC Finance Docket No. 26154 (Aug. 25, 1972). The relevant condition in both cases is the same: PCTC is required to "maintain and keep open all routes and channels of trade" via "existing junctions and gateways" unless otherwise authorized by the ICC.

It is an open question whether traffic conditions such as these, imposed on predecessor railroads, are binding on the successor, Conrail. While various route, rate, and division orders entered against predecessor railroads were found to be binding on Conrail in *Consolidated Rail Corp. v. ICC,* 590 F.2d 937 (D.C.Cir.1978), the parties have not referred us to any cases involving the binding effect of merger traffic conditions. We need not decide this issue, however, because even assuming *arguendo* that they are binding on Conrail (and assuming that P&W is entitled to assert an injury resulting from their violation), we find the ICC's determination that the conditions were not violated by Conrail to be supported by substantial evidence.

Conrail did not cancel any of its rates, routes, or divisions via Worcester. B&M, to be sure, eliminated a through train from Portland to Worcester—thus rendering the gateway somewhat less attractive. But B&M made the decision unilaterally, without consulting Conrail, and B&M was not bound by the traffic conditions in question. We believe that the record fully supports the ICC's conclusion that the traffic conditions were not violated.

### IV. ALLEGED MISROUTING

P&W claims that the defendants misrouted traffic that had been expressly routed by the shipper, thus violating 49 U.S.C. § 11710(a)(1), which provides,

(a)(1) When a carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission un-

der subchapter I of chapter 105 of this title diverts or delivers property to another carrier in violation of routing instructions in the bill of lading, both of those carriers are jointly and severally liable to the carrier that was deprived of its right to participate in hauling that property for the total amount of the rate it would have received if it participated in hauling the property.

The routings in question read "B&M–Worc.–PC" or "B&M–Worc.–CR," or the reverse. Beginning on April 1, 1976, the defendants routed this traffic through gateways (other than Worcester) where they could effect a direct interchange. P&W claims that the routings required use of the Worcester gateway and hence of P&W lines. The defendants, on the other hand, claim that the specification of Worcester in the routings indicated a desire by the shippers to interchange directly between B&M and Conrail (which was no longer possible as of April 1, 1976 at Worcester), and that they were therefore entitled to route the traffic to gateways where they could interchange directly, especially as the routings did not specifically mention P&W. The ICC accepted the defendant carriers' argument.

P&W argues that these instructions omitted a necessary intermediate carrier (namely, P&W at Worcester), and that the named carriers were obligated to seek additional instructions to clarify the "partial routings," citing *Southern Desk Co. v. Canadian Pacific Railway*, 181 I.C.C. 217 (1931) and *Williams & Sons v. Atlantic Coast Line Railroad*, 160 I.C.C. 631 (1929). These cases are distinguishable, however, in that some of the railroads named in the routings there did not have any direct connections, thus requiring the use of intermediate carriers. Here, on the other hand, the railroads do have a direct connection, thus obviating the need for an unnamed intermediate carrier. Moreover, the cases cited by P&W refer to routings that mention only carriers, not locations, as here. We are of the opinion that, in the circumstances, the ICC exercised a reasonable judgment in concluding that the defendant carriers were not required by the Act to route these shipments via P&W.[10] We sustain its conclusion that there was no violation of section 11710(a)(1).

## V. TARIFFS

P&W alleges that the defendants routed traffic away from the Worcester gateway without providing enough notice before filing tariffs, and in some cases, without filing tariffs at all, all in violation of 49 U.S.C. § 10761 (formerly ICA § 6(7)).[11] Its claims fall into three categories: first, that Conrail could not rely on the ICC's order in Special Permission No. 76–2814 (which authorized publication on less than statutory notice under certain conditions) to publish certain

---

**10.** No shipper complained that its goods were misrouted. The routings at issue were apparently made with respect to the facts as they existed prior to April 1, 1976 (*e.g.*, some routings still specified Penn Central as a carrier), when there was a direct interchange at Worcester that did not require the use of P&W. Thus, while the ICC made no specific finding to this effect, it could have concluded that the instructions here in issue did not reflect any intention by the shippers that P&W be utilized.

**11.** The statute provides,
(a) Except as provided in this subtitle, a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device.
(b) The Commission may grant relief from subsection (a) of this section to contract carriers when relief is consistent with the public interest and the transportation policy of section 10101 of this title. The Commission may begin a proceeding under this subsection on application of a contract carrier or group of contract carriers and on its own initiative for a water contract carrier or group of water contract carriers.
(c) This section shall not apply to expenses authorized under section 10751 of this title.

routing changes; second, that Penn Central could not publish a tariff supplement on behalf of Conrail pursuant to the Special Permission, and that even if it could, the tariff in question, Supplement 59, did not meet the notice requirements of the Special Permission; and third, that certain traffic was routed away from Worcester before tariffs were published or became effective.

As to the first claim, the ICC found that the routing changes were within the "blanket or special supplements" authorized to be published pursuant to the Special Permission. We see no error in this determination. The Special Permission was designed to facilitate the start-up of Conrail operations, and that is what the tariffs in question helped to accomplish.

As to the second claim, the Special Permission gave carriers the authority to publish tariff supplements "upon ten days' notice effective not earlier than April 1, 1976 . . . to establish additional routing from, to or via those carriers which are acquiring lines" under the RRR Act. Supplement 59 was filed by Penn Central on behalf of Conrail before April 1, 1976, to take effect on that date. P&W claims that as Penn Central was not an "acquiring railroad," it could not publish tariffs under the authority of this Special Permission. We see no merit in this contention.

Nothing in the Special Permission requires that tariffs be filed only by acquiring lines; it simply requires that the routes in question relate to routes from, to, or via acquiring lines, which these certainly were. Moreover, the Special Permission seems to contemplate the publication of tariffs before April 1, because it speaks of tariffs being effective on that date, thus implying that they could be published before it. Since Conrail did not become operative until April 1, it was necessary for another carrier to publish the tariffs on its behalf; this, too, must have been within the contemplation of the Special Permission. The publication of the Supplement by Penn Central on behalf of Conrail was therefore proper.

Turning to the notice requirement, P&W alleges that the Supplement was published on six days' notice rather than the ten days required by the Special Permission. We find that P&W is foreclosed from challenging this minor technical defect, because it has already suffered an adverse decision on the matter from the ICC, from which it did not appeal. The tariff was "legal" when it was filed with the ICC, and the ICC's acceptance of it— the order from which P&W did not appeal—turned it into a "lawful" tariff, immune from retroactive attack. *See Cincinnati, New Orleans & Texas Pacific Railway v. Chesapeake & Ohio Railway*, 441 F.2d 483, 488 (4th Cir. 1971) (dictum), citing *Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway*, 284 U.S. 370, 384–85, 52 S.Ct. 183, 184, 76 L.Ed. 348 (1932). We also reject P&W's argument that the ICC has no discretion to accept tariffs that are in any way defective, and that such tariffs are therefore void. Filed tariffs should not be treated as nonexistent simply because of minor filing irregularities. *See Genstar Chemical Ltd. v. ICC*, 665 F.2d 1304 at 1308 (D.C.Cir. 1981). *But see Chicago, M., St. P. & P.R. Co. v. Alouette Peat Products*, 253 F.2d 449 (9th Cir. 1958).

As to P&W's third claim, concerning the traffic alleged to have been handled without any tariffs, the ICC found that most of the traffic was routed pursuant to a valid operating agreement between Conrail and B&M, and that no tariff was needed while that agreement was in effect; a tariff was later filed for the route in question. We find the ICC's decision to be supported by substantial evidence. As to the rest of the traffic in this category, the defendants have agreed to adjust their divisions as necessary in accord with any evidence that P&W may produce of traffic that should have been routed over its lines.

## VI. DISMISSAL OF PENN CENTRAL

The ICC dismissed Penn Central as a party defendant because it found that it could grant no effective relief against Penn

Central: since it is no longer an operating railroad, no injunctive relief could be had, and because of an indemnity agreement between Penn Central and P&W, P&W would be obliged to save Penn Central harmless from any monetary liability. P&W admits this, but claims it desires a finding of liability against Penn Central in order that it may use it in other proceedings against Penn Central. But the same indemnity agreement refers not only to this case, but to any "ancillary proceeding." Thus, we can perceive no use that P&W could make of the finding it seeks, and it has not offered one. We affirm the dismissal of Penn Central.

### VII. REFUSAL TO ACCEPT NEW EVIDENCE

P&W sought to introduce certain newly discovered evidence after the record was closed in the hearings before the ALJ. The ICC exercised its discretion pursuant to 49 C.F.R. § 1100.84, and refused to receive the evidence, finding that it was merely cumulative. The ICC's denial of a petition to introduce newly discovered evidence will be reviewed only for abuse of discretion, *Yourga v. United States*, 191 F.Supp. 373, 377 (W.D.Pa.1961), and the fact that the evidence is cumulative is a proper factor to be considered by the agency. *Id.*

The evidence in question consists mainly of internal documents of the defendants discovered by P&W in an independent proceeding. While some of it tended to support some of P&W's arguments, P&W had already introduced other evidence in support of those arguments. The ICC found that the offered evidence was simply cumulative, and our review of the evidence and surrounding circumstances convinces us that its ruling did not constitute an abuse of discretion.

### VIII. REASONABLENESS OF DEFENDANTS' CONDUCT

Lastly, P&W alleges that the defendants violated 49 U.S.C. § 10701(a) (formerly ICA § 1(4)) [12] and 49 U.S.C. § 10101a (formerly preceding ICA § 1),[13] which essentially require rail carriers to engage in reasonable and nondiscriminatory conduct. P&W, however, points to no conduct of defendants that is independently violative of these sections. Its argument seems to depend entirely on the conduct it asserts is in violation of other sections of the Act. Having found no error in the ICC's determination that there were no violations of those other sections, we can see no aspect of the defendants' conduct which is violative of these sections either.

*The petition for review is denied and the decision of the Interstate Commerce Commission is affirmed.*

---

12. 49 U.S.C. § 10701(a) provides that

 (a) A rate (other than a rail rate), classification, rule, or practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title must be reasonable. A through route established by such a carrier (including a rail carrier) must be reasonable. Divisions of joint rates by those carriers (including rail carriers) must be made without unreasonable discrimination against a participating carrier and must be reasonable.

13. 49 U.S.C. § 10101a provides in pertinent part that

 In regulating the railroad industry, it is the policy of the United States Government—

 (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

 \* \* \* \* \* \*

 (3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission;

 \* \* \* \* \* \*

 (13) to prohibit predatory pricing and practices, to avoid undue concentrations of market power and to prohibit unlawful discrimination.