CONSOLIDATED RAIL CORPORATION,
Plaintiff,

v.

PROVIDENCE & WORCESTER
COMPANY, Defendant.

Civ. A. No. 77–445.

United States District Court,
D. Delaware.

June 4, 1982.

Robert K. Payson of Potter, Anderson & Corroon, Wilmington, Del., and Laurence Z. Shiekman, Gail P. Granoff and Edwin J. Butterfoss of Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiff.

R. Franklin Balotti of Richards, Layton & Finger, Wilmington, Del., and Richard J. Morvillo and Robert B. Donin of Verner, Liipfert, Bernhard, & McPherson, Chartered, Washington, D. C., for defendant.

## OPINION

LATCHUM, Chief Judge.

Consolidated Rail Corporation ("Conrail") brought this civil action on November 15, 1977, against the defendant, Providence & Worcester Company ("P&W"), seeking to recover certain interline freight revenues allegedly being unlawfully withheld by P&W. (Docket Item ["D.I."] 1.)[1] Count I of the complaint is based on P&W's alleged breach of four related agreements[2] wherein P&W and The Penn Central Transportation Company[3] ("Penn Central") agreed to apportion joint freight revenues according to specified divisional bases. Count II is based on P&W's alleged breach of its fiduciary duty as trustee of the funds collected on behalf of Conrail. The complaint seeks damages for the amounts that are allegedly being wrongfully withheld by P&W to the date of judgment, plus interest and costs, and an order directing P&W to apply the divisions bases set forth in the Agreements of 1973, 1974, and 1975 in settling the joint freight revenue accounts with Conrail until a different basis or bases are fixed by the Interstate Commerce Commission ("ICC"). (D.I. 1.)

On April 19, 1978, P&W filed an answer to Conrail's complaint, and asserted six counterclaims. (D.I. 26.) Conrail answered certain of P&W's allegations and filed motions with respect to the remaining counterclaims and affirmative defenses. (D.I. 31.) After a hearing on Conrail's motions, a Stipulation and Order was entered which, in essence, required P&W to amend its answer and counterclaims. (D.I. 46.) Accordingly, on April 30, 1979, P&W filed an amended answer ·containing twelve affirmative defenses and nine counterclaims. (D.I. 47.) Prior to trial, P&W agreed to dismiss with prejudice its first and sixth counterclaims along with its fourth and ninth affirmative defenses. (D.I. 93.) During the course of post-trial briefing, P&W conceded that it was abandoning its seventh and eighth counterclaims. (D.I. 124, p. 71, n. 79; D.I. 125, p. 5, n. 6.)

In the remaining counterclaims, P&W alleges that the 1976 Agreement relied on by Conrail is void due to fraud in the inducement, that because of breaches by Conrail, the 1976 Agreement is void or voidable at the option of P&W, that since 1976 all previous agreements respecting divisions between Conrail and P&W have been superseded by a stipulation entered into between Conrail, P&W and the plaintiff in a prior action captioned "*H. J. Baker & Bro. Inc. v. Providence & Worcester Co. and Consolidated Rail Corporation*, Civil Action No. 76–1364–G," in the United States District Court for the District of Massachusetts ("Baker Stipulation") (DX 7), that Conrail has breached the Baker Stipulation and that Conrail has misrouted traffic destined for the P&W. (D.I. 47.) Conrail replied to P&W's counterclaims on May 21, 1979, denying that the 1976 Agreement was procured by fraud or that Conrail had breached the 1976 Agreement, denying that the Baker Stipulation established divisions between

---

1. Jurisdiction exists by virtue of 28 U.S.C. § 1332. Conrail is a corporation organized under the laws of the Commonwealth of Pennsylvania pursuant to Section 301 of the Regional Rail Reorganization Act of 1973, as amended, 45 U.S.C. § 741, and has its principal place of business in Philadelphia, Pa.; P&W is a Delaware corporation with its principal place of business in Woonsocket, R.I. The amount in controversy exceeds $10,000 exclusive of interest and costs. Ancillary jurisdiction exists over P&W's counterclaims.

2. The four agreements are dated February 6, 1973 ("1973 Agreement") (Plaintiff's Exhibit ["PX"] 3); February 6, 1974 ("1974 Agreement") (PX 4); January 29, 1975 ("1975 Agreement") (PX 5); and March 8, 1976 ("1976 Agreement") (PX 9).

3. On April 1, 1976, The Penn Central Transportation Company conveyed most of its rail properties to Conrail.

the parties or that Conrail had breached the Baker Stipulation and denying that any traffic destined for P&W was misrouted by Conrail. (D.I. 48.)

A bench trial was conducted from January 18, 1982 through January 26, 1982. After carefully considering the sufficiency and weight of the testimony adduced at trial, the demeanor and credibility of the witnesses who testified, the documents admitted into evidence and the post-trial briefs of the parties (D.I. 116, 124, 125 & 128),[4] the Court enters this opinion which shall constitute the Court's findings of fact and conclusions of law in accordance with Rule 52(a), F.R. Civ.P.

## I. THE FACTS

### A. *Background Facts*

Prior to 1968, The Pennsylvania, New York Central, New Haven and Boston & Maine railroads were among those which participated in the transportation of freight in the Northeast section of the United States. (Tr. 84.)[5] Although the New Haven did not own all of its rail lines, it operated, as lessee, rail lines owned by the P&W and the Norwich and Worcester Railroad ("N&W"). (Tr. 270.) In 1961, the New Haven entered reorganization under the Bankruptcy Act. Thereafter, in 1968, the Pennsylvania Railroad merged with the New York Central, and the New Haven eventually was included in the Pennsylvania-New York Central Merger. (Tr. 85, 272.) However, the lease under which the New Haven operated the P&W line was rejected by the New Haven's trustees. (Tr. 271–274.) Nevertheless, the ICC ordered Penn Central after the merger to operate the P&W line under the rejected lease subject to two conditions which P&W ultimately found objectionable. As a result, P&W withdrew its application for inclusion in the merged Penn Central system and received the ICC's permission to begin independent operations over the line. (Tr. 272–73, 276.) At the time P&W commenced rail operations in 1973, its lines connected to the north and south with, among others, Penn Central. (Tr. 280.)

In the period immediately after the Penn Central merger and the inclusion of the New Haven railroad, but prior to P&W resuming independent operations, only two railroads conducted freight operations and interchanged traffic at Worcester, Massachusetts: Penn Central and B&M. (Tr. 312.) Although one portion of the track at Worcester was owned jointly in one-third shares by B&M, P&W and N&W, and a second portion was owned jointly by P&W and N&W (Tr. 313, 467–68), Penn Central leased and operated the P&W and N&W lines, and thus achieved a direct interchange with the B&M. (Tr. 312–13.) Even after P&W resumed independent operations in 1973, Penn Central continued to interchange directly with B&M at Worcester by virtue of its continuing lease and operation of the lines owned by the N&W. (Tr. 82–83, 287–88, 312–13.)

As an independent operating railroad, P&W was required, among other things, to establish joint routes rates and divisions with respect to freight traffic which it received from and/or delivered to a connecting carrier. (Tr. 280.) In particular, P&W negotiated and executed a divisions agreement with Penn Central. On February 6, 1973, P&W and Penn Central executed the "1973 Agreement" in which, *inter alia*, the divisional bases were established "unless and until a different basis or different bases are fixed by the Interstate Commerce Commission." (PX 3.) The 1973 Agreement was amended, in part, by the "1974 Agreement," (PX 4), which, in turn, was modified by a January 29, 1975 Agreement ("1975 Agreement") (PX 5). Therefore, prior to April 1, 1976, all revenues produced by the haul of joint freight by Penn Central and P&W were apportioned according to the divisional bases established in the 1973, 1974, and 1975 Agreements. (Tr. 429, 611–12.)

### B. *The 1976 Agreement*

In the face of mounting railroad bankruptcies, Congress sought a massive restruc-

---

4. Post-trial briefing was completed on May 10, 1982.

5. Tr. refers to pages of trial transcript.

turing of rail operations in the Northeast through the establishment of Conrail, a for-profit railroad corporation. 45 U.S.C. §§ 701, 741, 801. Pursuant to the Regional Rail Reorganization Act of 1973, as amended ("Rail Act"), the United States Railway Association ("USRA") was authorized to develop a Final System Plan ("FSP") designating the ownership and operation of trackage previously controlled by the railroads in reorganization. 45 U.S.C. §§ 711, 712, 716–19. Under the FSP, Conrail was charged with the responsibility of assuming and integrating the properties and operations of Penn Central and five other major bankrupt railroads. The Rail Act also provided that certain properties not conveyed to Conrail would be available for conveyance to other solvent railroads, one of which was P&W. Indeed, pursuant to the Rail Act and the FSP, P&W acquired the rail line from Worcester, Massachusetts to Plainfield, Connecticut, which previously had been owned by the N&W and operated under lease by Penn Central. (Tr. 312.) This acquisition by P&W included N&W's one-third ownership of the track formerly used by Penn Central to interchange with B&M at Worcester, and thereby severed the direct interchange between Conrail and the B&M at Worcester. (Tr. 312–14, 353.) Eventually, pursuant to a Supplemental Transaction, 45 U.S.C. § 745, P&W purchased from Conrail additional track on this line south to Groton, Connecticut. (Tr. 72.)

Other railroad companies which would connect with Conrail's lines after Conrail was activated were concerned that Conrail would not adopt "the joint routes, joint rates and divisions" which had been negotiated and were in effect between them and the railroads conveying property to Conrail

as the framework for Conrail's commencement of operations, but would seek to renegotiate all agreements to get more favorable terms. (Tr. 37–40.) In October 1975, the Conrail Activation Team, whose responsibility it was to plan and implement Conrail's start-up operations, met in Washington with representatives from five solvent railroads whose rail lines would connect with Conrail's lines once Conrail began operations on April 1, 1976.[6] (Tr. 37–42.) Although Conrail indicated its intention to adopt the joint routes, joint rates and divisions in effect between the railroads which were conveying property to Conrail and the solvent railroads whose lines would connect with Conrail lines after April 1, 1976, these five connecting carriers requested and received a formal, comprehensive agreement ("long form agreement") with respect to the adoption of these joint routes, joint rates and divisions and certain other provisions. (Tr. 42–45; PX 56A–D.)

As a result of individual negotiating sessions, Conrail also entered into a different, less comprehensive agreement ("short form agreement") with fourteen other railroads, including P&W. (Tr. 46–49.) The operating provisions of these individual agreements essentially required Conrail to adopt all joint routes, joint rates and divisions in effect between the railroads which were conveying property to Conrail and these fourteen carriers. (Tr. 49–50; e.g., PX 56, ¶ 1.) On March 1, 1976, Conrail issued, effective April 1, 1976, Consolidated Rail Corporation Freight Tariff 1 (ICC No. 1) ("Freight Tariff No. 1") which did in fact *adopt* the routes, rates and divisions[7] participated in by rail entities whose lines were being conveyed to Conrail.[8] (Tr. 109, 119–20; PX 10.)

---

**6.** The five railroads represented at the meeting were the Delaware & Hudson ("D&H"), Pittsburgh and Lake Erie ("P&LE"), Detroit, Toledo and Ironton ("DT&I"), Grand Trunk Western ("GTW"), and Toledo, Peoria and Western ("TP&W"). (PX 56A, B, C & D; Tr. 43–44.)

**7.** As a common carrier under the Interstate Commerce Act, Conrail was obligated, among other things, to file tariffs and establish routes, rates (including the divisions of joint rates), classifications, rules and practices with respect to the numerous railroad lines it planned to

operate. *See* 45 U.S.C. § 741; 49 U.S.C. §§ 10702—10703, 10761—10762.

**8.** Subsequently, fourteen supplements to Freight Tariff No. 1 were issued in part due to last minute adjustments by USRA, the administrative agency established by Congress to implement the rail restructuring, of the stations which Conrail was to acquire and to reflect further refinements in the properties acquired and services to be accomplished by Conrail. (PX 10 A–O.)

During the time that the Activation Team was conducting these negotiations, P&W, through its president Robert H. Eder ("Eder"), became aware of those negotiations and the fact that Conrail was willing to enter into agreements adopting all joint routes, joint rates and divisions in effect between those rail entities conveying property to Conrail and other, solvent connecting carriers. (Tr. 319–20.) As a result, Eder directed P&W's counsel, John Richardson, Esquire ("Richardson"), to contact James Sullivan ("Sullivan"), a member of the Activation Team. (Tr. 323.) After an initial phone call, Richardson sent Sullivan a letter outlining P&W's objectives for the negotiations. (Tr. 51–52; PX 75.)

On December 10, 1975, Eder and Richardson traveled to Philadelphia, Pennsylvania to meet with Sullivan. (Tr. 323.) According to Eder, Sullivan stated that Conrail was willing to enter into an agreement based upon either the standard long or short form agreement and that P&W must "take it or leave it." (Tr. 329.) Sullivan testified, however, that the long form agreement was no longer being used by Conrail and therefore was not discussed and was not offered by him as an alternative. (Tr. 58, 898.) In any event, after the short form agreement was presented and with little or no discussion, Eder and Richardson left the meeting with the short form agreement. (Tr. 331.)

The day following that meeting, December 11, 1975, Eder sent a letter to Sullivan stating that P&W would agree to the short form agreement. (Tr. 332–33, 52–53; PX 82.) Prior to receiving Eder's letter, however, Sullivan, on December 12, 1975, had sent a letter to Richardson informing him that a few minor changes were required in the short form agreement. (Tr. 333, 53–54; PX 84.) Sullivan enclosed a copy of the proposed revisions with his letter. (Tr. 333–34; PX 84.) However, P&W decided to reject the changes suggested by Sullivan and, instead, without informing Conrail, Eder instructed Raymond D. Finizia, a P&W Vice President, to sign the original short form agreement on February 24, 1976. (Tr. 335.) The signed document was for-

warded to Sullivan who, in turn, had the agreement executed by Richard Spence, President of Conrail, on March 8, 1976 and returned a copy of it to P&W. (Tr. 55–57; Tr. 337; PX 113, 128.) Conrail adopted all joint routes, joint rates and divisions which existed between the conveying railroads, including Penn Central, and P&W, at the time Conrail commenced operations by filing Freight Tariff No. 1, effective April 1, 1976. (Tr. 350, 109, 119–20; PX 10, 10A–0.)

### C. The Baker Stipulation

Prior to April 1, 1976, Penn Central also owned two branch lines consisting of 4.5 miles of track in Slatersville and Wrentham, Rhode Island ("branch lines"). (Tr. 386, 944.) Because these branch lines could only be reached over the lines of P&W, after P&W commenced independent operations in 1973, the ICC ordered P&W to operate the branch lines "for the account of" Penn Central unless and until the parties could agree to a different operating arrangement. (Tr. 387; 949.) In accordance with the ICC's Order in Finance Docket 26154, P&W and Penn Central executed a one year agreement on February 3, 1973, under which P&W would operate the branch lines. This agreement was renewed for successive periods in 1974 and 1975. (Tr. 387.)

Almost immediately after the branch lines were conveyed to Conrail on April 1, 1976, a dispute arose as to the manner in which the lines were to be serviced. Eder, in a phone conversation on April 5, 1976 with Ray Neal ("Neal"), then Director of Operations Planning for Conrail (Tr. 935–37), stated P&W's position to be that the agreement between P&W and Penn Central had expired and that, pursuant to Finance Docket 26154, P&W would operate the branch lines "for the account of" Conrail (Tr. 390, 952–53), which, in P&W's view, meant that P&W must be specified on the waybill as the originating or terminating carrier. (Tr. 388–392.) Neal disagreed with Eder, reasoning that since Conrail owned the stations on these branch lines, P&W could not be listed as the terminating

or originating carrier.[9] (Tr. 949; DX 141.) Eder refused to discuss a temporary arrangement to move traffic while Conrail and P&W attempted to resolve the problem. (Tr. 952–53.)

Thereafter, on April 6, 1976, a lawsuit was filed in the district court for the District of Massachusetts by a shipper, H. J. Baker & Bro., Inc. ("Baker"), against Conrail and P&W due to the railroads' refusal to provide service to Baker on the Slatersville branch line. *H. J. Baker & Brothers, Inc. v. Providence and Worcester Co. and Consolidated Rail Corporation*, Civil Action 76–1364–G (D.Mass. April 6, 1976). In that suit, Baker alleged that it had tendered three rail cars at Forestdale, Rhode Island for transportation; that P&W refused to accept such cars unless the bill of lading was issued in the name of P&W and that Conrail refused to accept the cars for further transportation unless the original bill of lading was issued in the name of Conrail. (Tr. 391–92.)

Due, in part, to Conrail's concern over having a Temporary Restraining Order issued against it during the first week of its existence, it sent its Boston counsel, Richard J. Ferriter, Esquire ("Ferriter"), to the federal courthouse in Boston on the morning of April 7, 1976, to meet with all concerned parties in an effort to resolve the dispute. After arriving at the courthouse, Ferriter spoke by telephone with Neal who was in Philadelphia. (D.I. 84A, p. 33.) At the conclusion of his conversation with Ferriter, Neal also spoke with Eder. (Tr. 395–396; D.I. 84A, p. 33.) As in their earlier conversation, Eder and Neal limited their comments and discussions to the narrow issue of settling the branch lines dispute and the subject of divisions was not discussed. (Tr. 396–98.)

Shortly after Eder and Ferriter talked with Neal, the parties appeared before Judge Garrity, who had been assigned the case. (Tr. 398; D.I. 84A, pp. 32–33.) Judge Garrity requested the parties to attempt to reach a settlement and return to him when they did. (D.I. 84A, p. 33.) As a result, the parties and their respective counsel convened in a large conference room in the offices of P&W's counsel, Joseph Ryan ("Ryan"). (D.I. 84A, pp. 31–35; Tr. 398–99.)[10]

During that day P&W drafted language for a stipulation which would satisfy Baker's complaint. (Tr. 399, 404, 410.) The language was read to Neal during a conference call. (Tr. 410; Tr. 977.) The discussions almost exclusively focused on the procedures which would be followed in operating the branch lines, but P&W insisted on the inclusion of a paragraph which required that traffic actually to be interchanged between Conrail and P&W be interchanged at Worcester. (Tr. 400, 402, 408; DX 7.) During such discussions, the subject of divisions was never raised or discussed (Tr. 421), and Eder never suggested to Conrail or anyone that this paragraph which he suggested had any application broader than the operating agreement it appeared to be. (Tr. 603–08, 983.) Eventually a stipulation was executed which resolved the Baker lawsuit ("Baker Stipulation") (DX 7; Tr. 420–21.)

## II. THE DISPUTED ISSUES AND THE PARTIES' CONTENTIONS

The present dispute between the parties centers on the interpretation of two contractual agreements—the 1976 Agreement and the Baker Stipulation. Conrail contends that the 1976 Agreement controls the instant suit, and is a valid and binding contract which required Conrail to *adopt* all existing joint routes, joint rates and divisions between Penn Central and P&W at the time Conrail commenced operations. Conrail further contends that it fulfilled that obligation by filing the Adoption Notice as Freight Tariff No. 1, effective April

---

**9.** Neither Eder nor Neal brought up the subject of divisions during this initial conversation nor at any later time. (Tr. 389–90.)

**10.** At the meeting which took place in the large conference room, P&W was represented by Eder, and its counsel, Joe Ryan, Esquire, and John Richardson, Esquire. Baker's counsel, William Kennan, Esquire, and its traffic manager, Lindley Pim, were also in attendance. Finally, in addition to Ferriter, Neal represented Conrail. However, Neal was not in Boston but negotiated on behalf of Conrail by telephone from Philadelphia. (Tr. 394–95, 398–400.)

1, 1976, and P&W is obligated to remit to Conrail the appropriate share of joint freight revenue as set forth in the 1973 Agreement, as amended by the 1974 and 1975 Agreements, which governed the divisional bases between Penn Central and P&W as of March 31, 1976.

On the other hand, P&W views the 1976 Agreement as imposing on Conrail the duty not only to *adopt* such routes, rates and divisions, but also (1) to maintain historical levels of traffic over those routes; (2) to prevent Conrail from establishing any new routes, rates or divisions with other railroads prior to April 1, 1976; and (3) to prevent Conrail from *using* any such new routes, rates or divisions after April 1, 1976. P&W contends that because Conrail negotiated with other carriers to publish new routes not involving P&W prior to April 1, 1976, and used such routes after April 1, 1976, the 1976 Agreement was procured by fraud and is void. In the alternative, P&W argues that even if the 1976 Agreement was valid on April 1, 1976, the Agreement is voidable at P&W's option because Conrail breached the Agreement as P&W reads it, and in any event the Agreement was superseded by the Baker Stipulation executed on April 7, 1976. P&W also requests damages for Conrail's alleged breaches of contract.

In response to these contentions, Conrail maintains (1) that Conrail has fulfilled its obligations under both the 1976 Agreement and the Baker Stipulation; (2) that even if the 1976 Agreement were void or voidable, which Conrail denies, the Adoption Notice filed by Conrail has the same effect of keeping in place the route, rate and divisions agreements applicable as of March 31, 1976; and (3) that under no circumstances can the Baker Stipulation be interpreted as an agreement between the parties with respect to divisions or the preservation of historical traffic patterns because it was executed only to resolve an isolated dispute between the parties with respect to the *operation* of two small branch lines and did not modify or supersede specific divisional agreements previously executed by the parties or to require traffic be routed over P&W's lines, except that the Baker Stipulation did provide for the interchange of Con-

rail-P&W traffic at Worcester where P&W is shown as a carrier on the waybill.

## III. MEANING OF 1976 AGREEMENT

The pertinent operating provision of the 1976 Agreement entered into on March 8, 1976, between Conrail and P&W reads:

1. CONRAIL agrees that on or before the date of conveyance pursuant to the provisions of Section 303 of the Regional Rail Reorganization Act of 1973, 45 U.S.C. Section 743, it will, except to the extent mutually agreed upon by the parties, file tariffs adopting all joint routes, joint rates and divisions published by railroads in reorganization with respect to the rail properties being conveyed to it insofar as the aforesaid joint rates and joint routes are participated in by RAILROAD.

(PX 9.)

Clearly under the express language of the quoted provision, Conrail simply agreed to "file tariffs adopting all joint routes, joint rates and divisions" which existed between the conveying railroads and P&W at the time Conrail commenced operations. This express obligation to P&W was fulfilled when Conrail, effective April 1, 1976, filed Freight Tariff No. 1 (PX 10), which adopted all joint routes, joint rates and divisions then in existence between any conveying railroad and P&W.

Nevertheless, despite this unambiguous language, P&W contends that the above agreement not only obligated Conrail to file tariffs adopting existing routes, rates and divisions between Penn Central, a conveying railroad, and P&W, but also required Conrail: (1) to refrain from publishing new routes with other railroads; (2) to refrain from using new routes; and (3) to preserve the historical patterns of traffic through the Worcester gateway. (D.I. 124, pp. 36, 39, 70.) P&W relies for support of this contention upon a preamble of the 1976 Agreement which reads:

In order to avoid disputes as to the respective obligations of CONRAIL and RAILROAD to each other in respect to rates, divisions, and through routes via existing junctions and gateways, as well

as via junctions or gateways contemplated by the Final System Plan, and to facilitate the flow of traffic between them, the parties desire to set forth their respective obligations to each other concerning traffic moving over joint through routes.

P&W argues that this introductory statement indicates that the purpose of the 1976 Agreement was to freeze the historical pattern of traffic through the Worcester gateway and to otherwise preserve the status quo of train movements until changed by agreement of the parties or by the ICC. The Court is unable to agree. There is nothing in the preamble from which to conclude that Conrail either expressly or implicitly agreed not to publish new routes with other railroads, or that it would refrain from *using* new routes or that it would adhere to all historical patterns of traffic. Indeed, the preamble, by referring to "junctions or gateways contemplated by the Final System Plan," if anything, indicated the contrary.

▇▇▇ Absent illegality, unconscionability, fraud, duress, or mistake, the parties are bound by the terms of their contract. *Mellon Bank, N. A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009 (C.A. 3, 1980).[11] Parties are bound not by their subjective intent, but by the objective manifestations of their intent, and the most important manifestation of intent "is the words they use in their written contract." *Mellon, supra,* 619 F.2d at 1009. In determining whether a contract is ambiguous or clear, a court may consider circumstances surrounding its execution. However, when the words are clear and unambiguous, the intent of the parties is to be determined only from the express language of the contract. The *Mellon* court stated this proposition as follows:

> Thus, the sanctity of the written words of a contract is embedded in the law of contract interpretation .... "[A] Court will make no inference or give any construction to the terms of a written contract that may be in conflict with the

clearly expressed language of the written agreement."

619 F.2d at 1009, *quoting National Cash Register Co. v. Modern Transfer Co.,* 224 Pa.Super. 138, 142, 302 A.2d 486, 488 (1973). The 1976 Agreement used clear and unambiguous terms. Conspicuously absent from its express terms is any reference to an obligation that Conrail preserve historical traffic patterns over any *adopted* route, or a prohibition against Conrail *publishing* or *using* additional routes. The contract clearly and simply required Conrail to "file tariffs adopting all joint routes, joint rates and divisions published by railroads in reorganization with respect to the rail properties being conveyed to it *insofar as the aforesaid joint rates and joint routes are participated in by [P&W]*" (emphasis supplied).

The 1976 Agreement does not address routes between Conrail and railroads other than P&W; it does not address traffic patterns, historical or otherwise; it does not address routing practices; and it does not address sales solicitation. Moreover, there is no creditable evidence to demonstrate that the 1976 Agreement was intended to address any issue not expressly set forth in the Agreement. The testimony of the parties describing the negotiations of the 1976 Agreement is substantially consistent and it shows that there was no bargaining, no discussion of expectations and no unwritten promises. (D.I. 116, pp. 7–13; D.I. 124, pp. 14–15.) Conrail, after being approached by P&W, simply offered an agreement to file a tariff adopting joint routes, rates and divisions published by the railroads in reorganization with respect to the rail properties being conveyed insofar as those rates and routes were participated in by P&W. P&W accepted and executed that agreement. (PX 9.)

Finally, it lacks common sense to believe that Conrail by contract with P&W would bind itself at its inception to refrain from publishing new routes with other railroads or refrain from *using* new routes or bind

---

11. The parties agree that the validity and the construction of the 1976 Agreement is governed by Pennsylvania law and have so briefed

that question on this basis. (D.I. 116, p. 21, n.21; D.I. 124, pp. 36–37, n. 36.)

itself to maintaining the status quo for traffic patterns until some unpredictable future date. After all, Conrail was the entity created by Congress to carry out a massive reorganization of the rail system in the Northeast region of the United States as designed by USRA in the FSP. USRA's statutory goal in the development of the FSP included:

(1) the creation, through a process of reorganization, of a financially self-sustaining rail and express service system in the region;

(2) the establishment and maintenance of a rail service system adequate to meet the rail transportation needs and service requirements of the region;

\* \* \* \* \* \*

(7) the movement of passengers and freight in rail transportation in the region in the most efficient manner consistent with safe operation, including the requirements of commuter and intercity rail passengers service; the extent to which there should be coordination with the National Railroad Passenger Corporation and similar entities; and the identification of all short-to-medium distance corridors in densely populated areas in which the major upgrading of rail lines for high-speed passenger operation would return substantial public benefits;

45 U.S.C. §§ 716(a)(1), (2), (7).

Conrail's mandate to rehabilitate, improve and modernize the rail properties conveyed to it and to promote competition in the railway industry suggested change. The Court of Appeals for the First Circuit indicated as much when it stated:

[T]he large-scale rail reorganization that established Conrail might well be expected to cause major rerouting based on greater efficiencies made possible by the consolidation of formerly separate lines.... Effective competition requires flexible responses to changing circumstances.

*Providence and Worcester Railroad Co. v. USA & ICC*, 666 F.2d 736, 740 n. 7 (C.A. 1, 1981).

Therefore, the Court, based on the express language buttressed by the surrounding circumstances, concludes that the 1976 Agreement simply required Conrail to file on or before April 1, 1976, the date of conveyance, tariffs adopting existing joint rates, routes and divisions as published by the reorganized railroads insofar as those rates and routes were participated in by P&W. Contrary to P&W's contention, the 1976 Agreement did not obligate Conrail (1) to maintain historical levels of traffic over those routes, (2) to refrain from establishing new routes, rates or divisions with other railroads prior to April 1, 1976, or (3) to refrain from using any such new routes, rates or divisions after April 1, 1976.

## IV. CONRAIL SATISFIED ITS OBLIGATION UNDER THE 1976 AGREEMENT

Conrail fully satisfied its only obligation under the 1976 Agreement when, effective April 1, 1976, it filed Freight Tariff No. 1 (PX 10), which adopted all joint routes, joint rates and divisions which existed on March 31, 1976, between the reorganized railroads conveying property to Conrail and P&W. These routes, rates and divisions were never cancelled. Thus, Conrail did not breach the 1976 Agreement.

## V. THE FRAUD ISSUE

P&W contends that even if the 1976 Agreement has the meaning that the Court has found, it was procured by fraud, is voidable, and should be rescinded. In order to prevail on this claim of fraud, P&W must demonstrate first, that Conrail made a misrepresentation to P&W, and second, that P&W justifiably relied upon that misrepresentation. *College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 360 A.2d 200, 206 (1976); *Berger v. Pittsburgh Auto Equipment Co.*, 387 Pa. 61, 127 A.2d 334, 335 (1956); *National Building Leasing, Inc. v. Byler*, 252 Pa.Super. 370, 381 A.2d 963, 966 (1977); *Greenwood v. Kadoich*, 239 Pa.Super. 372, 357 A.2d 604, 607 (1976). Moreover, P&W must make this showing by "clear and convincing" evidence. *Thomas v. Seaman*, 451 Pa. 347, 304 A.2d 134, 137 (1973) (clear, precise and convincing evidence of fraud required).

The evidence in this case, however, fails to demonstrate that Conrail ever misrepresented to P&W its intentions with respect to the 1976 Agreement. From the outset of the discussions with Eder and Richardson, Conrail's sole objective was to assure P&W, a future connecting carrier, of Conrail's intention to keep in effect the joint routes, joint rates and divisions which existed between the railroads which conveyed property to Conrail and P&W. (Tr. 41, 44–45.) P&W appeared to have been aware of this intention because it admitted in paragraph 36 of its third affirmative defense that "during the aforesaid negotiations with Conrail, P&W was lead to believe that Conrail, by entering into the 1976 Agreement, *would adopt the routes, rates and divisions in effect between the predecessors of Conrail and P&W.*"[12] (D.I. 47, ¶ 36.) Moreover, no evidence was presented showing that Conrail ever made any other representation to P&W.

A misrepresentation would require an assertion that is not in accord with the facts. Restatement (Second) of Contracts § 159. By adopting all joint rates, joint routes and divisions in effect between the railroads which conveyed property to Conrail and P&W, Conrail accomplished precisely what P&W alleges Conrail led it to believe would be accomplished. Thus, there was no misrepresentation, in this regard.

P&W, nevertheless, argues that it was defrauded by Conrail because Conrail, without advising P&W, was negotiating and arranging with the Boston and Maine Railroad ("B&M"), to publish new routes, rates and divisions for the interchange of traffic between the two companies via Rotterdam Junction and Springfield that would avoid the Worcester gateway. However, Conrail never told P&W that it would not negotiate with other carriers to establish new routes. (Tr. 331, 60.) In fact, the testimony presented by both Conrail and P&W was consistent in showing that very little discussion occurred between the two in negotiating the 1976 Agreement. There was only one meeting between the parties (on December 9, 1975), and at that meeting there was very little discussion. (Tr. 329–31.) Sullivan, head of Conrail's marketing activation team, simply presented the short form agreement which Conrail was willing to sign. (Tr. 58, 898.) Eder recalled being given a choice of two forms of agreement—the short form ultimately executed by the parties and a long form which Sullivan denied offering and which Eder admittedly did not possess when he left the meeting. (Tr. 329–32.) In either case, there was no discussion of P&W's now expressed hope that Conrail would not establish new rates competitive with those of P&W. Other than a brief telephone conversation in which Eder orally agreed to sign the short form agreement, the only other communication between P&W and Conrail on the 1976 Agreement was by letter. (Tr. 332–38; PX 82, 84, 113, 128.) Thus, as stated by counsel for P&W in his opening statement (Tr. 9), there was no evidence of any direct misrepresentation by Conrail to P&W.

P&W bases its claim of fraud solely on Conrail not informing P&W that it was negotiating with other carriers to establish new routes which did not involve P&W. In order for silence to be considered a misrepresentation, there must exist a *duty* to disclose facts which are *material*. See *Copper Process Co. v. Chicago Bonding & Ins. Co.,* 262 F. 66, 73 (C.A.3, 1920); *Carr-Consolidated Biscuit Co. v. Moore,* 125 F.Supp. 423, 433 n.29 (M.D.Pa.1954); *Federal Land Bank of Baltimore v. Fetner,* 269 Pa.Super. 455, 410 A.2d 344, 348 (1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980). Here, neither a duty nor materiality has been shown.

As Eder testified, "railroads do get together to enter into new routes, new rates or new divisions," matters, he agreed, which are not generally discussed with another railroad which serves a competitive route. (Tr. 569–70.) Thus, no duty to disclose Conrail's negotiations with other carriers was or could have been established.

---

12. An admission in a pleading is a judicial admission binding on a litigant. *Giannone v. United States Steel Corp.,* 238 F.2d 544, 547 (C.A.3, 1956); *Hall v. United States,* 314 F.Supp. 1135, 1137–38, n.3 (N.D.Cal.1970); McCormick, Evidence § 265 (2d ed. 1972); IV Wigmore, Evidence § 1064 (Chadbourne rev. 1981).

Moreover, P&W did not establish the materiality of discussions with other carriers concerning new routes because the contract at issue here, the 1976 Agreement, did not purport to address the issue of new routes—with P&W or anyone else. The 1976 Agreement was merely a written manifestation of Conrail's intent to adopt existing joint routes, joint rates and divisions and to maintain good relationships with Conrail's future connecting railroads by not seeking to eradicate the existing structure. The framework for Conrail's commencement of operations essentially would be the one already in existence. However, no representations were ever made, nor were they required to be made, that Conrail would not seek to add to that framework when necessary or desirable due to the change in ownership of railroad properties or for other reasons. (Tr. 331.) It is only logical that Conrail, in fact, would seek additional routing in light of the whole purpose of the creation of Conrail. If P&W, at the time of the 1976 Agreement, coveted the hope that Conrail would not publish routes competitive to existing routes involving P&W, the record is devoid of any evidence that P&W expressed that hope to Conrail during that time period. Furthermore, despite P&W's present contentions that it was entitled to and expected not only to receive overhead traffic but also to receive all traffic which had historically passed through Worcester, evidence contemporaneous with P&W's acquisition of its new lines indicate no such expectation or entitlement. (Tr. 561–63; PX 202; PX 204; DX 52.) But even if there were such a secret hope on P&W's part, the record is devoid of evidence that Conrail induced P&W to believe that such help was well-founded. The Court, therefore, concludes that the 1976 Agreement was not induced by fraud and that it is valid and enforceable unless superseded by the Baker Stipulation (PX 7).

13. "Old Stations" refers to freight stations served on lines between Worcester and Providence operated by P&W both prior to and after April 1, 1976. On the other hand, "New Stations" are those freight stations served by

## VI. THE BAKER STIPULATION

The second agreement on which P&W bases its breach of contract claims is the April 7, 1976 Baker Stipulation (PX 7) entered into by P&W, Conrail, and a shipper, H. J. Baker & Bro., Inc., to resolve a dispute involving 4.5 miles of dead-end track which caused Baker's cars to be stranded. During the short and intense negotiations to forestall the issuance of a threatened temporary restraining order, P&W insisted on the inclusion of the following paragraph:

(4) Conrail and P&W stipulate and agree that all traffic interchanged between Conrail and P&W will be interchanged at Worcester, Massachusetts with [two exceptions not relevant here.]

(PX 7.) P&W now contends that this single sentence (1) supersedes the 1976 Agreement with respect to divisions on Old Stations (Fourth and Fifth Counterclaims); and (2) establishes divisions for New Stations (Fifth Counterclaim).[13]

Under Massachusetts law,[14] as in Pennsylvania, in the absence of fraud, one who signs a written agreement is bound by its terms. *Gifford v. Gifford*, 354 Mass. 247, 236 N.E.2d 892, 893 (1968). Moreover, where a written agreement reasonably appears to be complete and specific, it is presumed that the parties intended the writing to be a complete and final statement of the whole transaction. *Bendetson v. Coolidge*, 390 N.E.2d 1124, 1127 (Mass.App.1979). Thus, the words of the contract are the most important evidence in determining the intent of the parties, and evidence of negotiations is not admissible to contradict the terms of an integrated agreement. *Louis Stoico, Inc. v. Colonial Development Corp.*, 369 Mass. 898, 343 N.E.2d 872, 875 (1976); Restatement (Second) of Contracts §§ 215, 212, comment (b). As the Court stated in *Robert Industries, Inc. v. Spence*, 362 Mass. 751, 291 N.E.2d 407 (1973), "[i]nterpretation

P&W on rail lines conveyed to it on April 1, 1976, pursuant to the Rail Act.

14. The parties agree that Massachusetts law applies. (D.I. 116, p. 40, n. 40; D.I. 124, p. 61, n. 65.)

is directed to the meaning of the terms of the writing in the light of the circumstances, not to the meaning of the conversation of the parties in the course of their negotiations." 291 N.E.2d at 410. Therefore, the Baker Stipulation must be interpreted in the first instance by focusing on the meaning of the terms embodied in the writing.

P&W contends that, regardless of the validity of the 1976 Agreement, the Baker Stipulation supersedes all previous divisions agreements and governs all divisions between the two parties. However, a cursory review of the express terms embodied in the Baker Stipulation reveals that it was not written as a divisions agreement at all. Indeed, the word "division" does not appear in the entire contract. Furthermore, unlike the earlier divisions agreements signed between P&W and Penn Central (PX 3, 4 and 5), the Baker Stipulation fails to provide a divisions formula or bases to be used by P&W and Conrail to apportion joint freight revenues.

Paragraph 4 of the Baker Stipulation on its face only requires "that all traffic interchanged between Conrail and P&W will be interchanged at Worcester, Massachusetts . . . ." Nothing in those written words suggests that they were intended to address the subject of divisions. The language of the Baker Stipulation viewed as a whole does not deal with that subject.

■ Massachusetts law makes clear that when parties have entered into a binding, integrated contract, the agreement may not be interpreted to include subject matters not addressed by the terms of the contract. *Robert Industries v. Spence*, 362 Mass. 751, 291 N.E.2d 407 (1973). In *Robert Industries*, the Massachusetts Supreme Court addressed a claim by a plaintiff that a lease given to it by a third party gave plaintiff an exclusive right to sell food for money on George's Island in Boston Harbor. Plaintiff was challenging defendant's use of the Island to conduct charter sightseeing trips which included a meal on the Island. Defendant was not a lessee of the third party. Rejecting plaintiff's attempt to include defendant's business in the activities prohibited by the lease, the Court stated:

The critical provisions of the lease here in issue forbids the [third party] to grant a competing "lease"; it also reserves to the [third party] "the right to permit" certain activities by "patrons" not described as lessees. If the first part of the provision is limited to leases, the plaintiff argues, the second part has no effect, except perhaps as an unnecessary partial description of what is not a lease. Reading the provision as a whole and seeking to give meaning to each part, the argument continues, we must hold that all that is not permitted is forbidden and that "lease" includes any commercial competition with the plaintiff. *But the lease nowhere says that activities not expressly permitted are forbidden. It simply does not deal with competition other than competition by lessees.* The plaintiff's reading places a strain on the word "lease" greater than it can bear.

*Id.* at 755–56, 291 N.E.2d at 410. (Emphasis added.)

■ As in *Robert Industries*, P&W's interpretation of paragraph 4 places an undue strain on the words of the stipulation. The words of the stipulation are clear, and cannot be interpreted as governing *divisions*, a subject which the contract simply does *not* include or address.

Moreover, the circumstances surrounding the execution of the Baker Stipulation lend support to interpreting the document as a stipulation of limited scope unrelated to divisions. Immediately after Conrail began operations, it was informed that there was a problem on the Slatersville and Wrentham branches and that H. J. Baker & Bro., Inc., a shipper with cars that were not being moved threatened to bring a lawsuit. Neal, a Conrail employee in the operations area, was requested to handle the problem.

On April 5, 1976, Neal telephoned Eder to discuss a possible solution but Eder refused to discuss a temporary compromise until a solution of the problem was found. (Tr. 952–53, 961, 390.) In that phone call Neal proposed that P&W continue to operate on the switching fee arrangement for moving traffic on the branch lines but neither Neal

nor Eder discussed the subject of divisions. (Tr. 389–90, 953, 956–57.) Baker then commenced its lawsuit against Conrail and P&W in the United States District Court in Boston. Conrail, of course, was anxious to avoid the adverse publicity from this impasse which could result in the issuance of a temporary restraining order during its first week of operations. (Tr. 947, 397.) When the representatives [15] of the parties met at the Boston Courthouse on the morning of April 7, 1976, their express purpose was to resolve the dispute regarding *operating procedures* for moving traffic on the 4.5 mile Slatersville-Wrentham branch lines. (Tr. 393, 968–69.) In addition, in Eder's subsequent telephone conversation with Neal on the morning of April 7 from the U. S. Courthouse, he again did not discuss or mention the subject of divisions or his desire to negotiate a divisions agreement. (Tr. 396–98, 969–70.) The negotiating meeting adjourned to Ryan's law offices on April 7, and several conference telephone calls were again placed to Neal in Philadelphia regarding the terms of the Baker Stipulation working out the operating agreement for the branch lines, but again in none of those calls was the subject of divisions ever mentioned or discussed. (Tr. 421; D.I. 84A, pp. 54–55.) Following negotiations and discussions, Richardson drafted provisions to be incorporated in the operating agreement (Tr. 404) and these provisions were discussed by telephone with Neal. Paragraphs 1, 2 and 3 of the Baker Stipulation in general provided that P&W would operate their branch lines on a switching basis for 60 days and thereafter would operate the branches "for the account of" Conrail in the absence of any other agreement during the 60-day period and the terms "operating for the account" were spelled out in the Stipulation. (PX 7, ¶¶ 1–3; Tr. 403–04, 410.) When these provisions were agreed upon, Eder then demanded for the first time that the Stipulation contain another paragraph that Richardson had drafted which ultimately became paragraph 4 of the Baker Stipulation. (Tr. 410, 415.) Eder told Neal either paragraph 4 would be included in the Stipulation or there would be

no stipulation at all. (Tr. 410, 415.) Neal and other Conrail employees with whom he was conferring in Philadelphia did not understand why Eder was insisting on that provision (Tr. 973) and when Neal suggested a clarifying phrase "for operating convenience" to paragraph 4, Eder adamantly refused to make any changes and stated that it must stay as drafted by P&W or there would be no agreement. (Tr. 975, 983, 604–08.) Neal suggested the clarifying phrase because Conrail believed from Penn Central's past experience in dealing with P&W that P&W might try in the future to use the language of paragraph 4 to base an *argument* in some way for more money either by demanding higher switching charges, by changing flat car rates or by affecting divisions. (Tr. 977–81.) Thus, while Neal believed that even in the absence of his suggested clarifying terms paragraph 4 would not affect divisions, he nevertheless thought it might give P&W an argument on that score in the future. (Tr. 977, 981.)

Neal's intuition turns out to have been sound. Eder for P&W has now disclosed the secret intent he held during negotiations for insisting upon paragraph 4 of the Baker Stipulation. He has now fashioned an argument on that language contending that this paragraph supersedes all previous binding divisions agreements. But it is equally clear that had Eder revealed during the negotiations his then undisclosed and secret intent, Conrail, despite its embarrassment of a possible restraining order, would not have signed the agreement. (Tr. 841.)

P&W now argues that it "had the upper hand, and Eder saw this [the negotiations of an operating agreement for the branch lines] as an opportunity to exact a concession from Conrail on several fronts as a part of the settlement." (D.I. 124, p. 64.) P&W further argues that Conrail was well-aware that divisions would undoubtedly be affected but capitulated by agreeing to paragraph 4. (*Id.* p. 65.) The Court is unable to agree with P&W's arguments.

First, Conrail's negotiators were kept completely in the dark as to Eder's intent.

15. *See* Note 10, *supra.*

(Tr. 607–08.) They did not view the express language of paragraph 4 as in any way affecting divisions but as an operating agreement; they simply believed that the language, without the clarifying phrase suggested, might be used in the future by P&W as a bases for some argument to exact "more money" from Conrail. However, such an undisclosed or unexpressed intent held by one party at the time of negotiations as to the meaning of a contract is of no legal significance and it cannot be resorted to later to overthrow the effect of words actually used in the agreement. 3 Corbin On Contracts (1960 ed.) § 438, p. 67. Having viewed and heard the testimony of the witnesses, the Court is convinced that during negotiations Eder's intent that paragraph 4 of the Baker Stipulation was to become a binding divisions agreement was never disclosed or expressed to Neal or his associates and was never understood by them to be such. The Court may not interpret the words of an agreement so as to hold one party bound in accordance with the wholly unexpressed meanings - and understandings of the other. 3 Corbin On Contracts (1960 ed.) § 538, p. 67.

Second, it is unrealistic to believe that Conrail would have agreed to paragraph 4 of the Baker Stipulation had it known Eder's intent that the provision was to supersede all prior divisions agreements between the parties. It is incredible to think that Conrail would in this offhand manner give up millions in freight divisions to avoid unwanted publicity that might arise from the issuance of a restraining order in the Baker case.

Third, it is inconceivable that had both parties intended to agree upon freight divisions that it would have been accomplished in such a "slipshod" manner. After all, freight divisions are integral parts of the financial life-blood of railroads and they enter into division agreements to allocate the revenue earned on joint routes among the participating carriers. Such agree-

ments must specify the proportion of revenue each railroad earns on a road haul. (Tr. 183, 191–92, 193–94.) Paragraph 4 of the Baker Stipulation provides no formula for dividing revenues and indeed fails even to mention divisions. It is only necessary to compare the 1973, 1974 and 1975 Agreements (PX 3, 4 & 5) with the Baker Stipulation (PX 7) to conclude that railroads do not enter divisions agreements using the words embodied in paragraph 4 of the Baker Stipulation, nor do they supersede previously binding divisional agreements by the use of such words. (Tr. 183, 188f–188g.)

The Court concludes from the evidence and the creditable testimony submitted that paragraph 4 of the Baker Stipulation is, as its plain words indicate, an operating provision and not a divisions agreement; it requires only that traffic actually interchanged between Conrail and P&W be interchanged at Worcester. Eder's undisclosed and unexpressed intent to the contrary during the negotiations cannot be resorted to contradict the plain words which Eder and P&W's attorneys drafted. The Baker Stipulation does not supersede the prior freight divisions.

Finally, assuming *arguendo* that there is an ambiguity [16] in the words used in paragraph 4 of the Baker Stipulation concerning whether they covered divisions, the agreement must be construed most strongly against P&W which drafted the paragraph. *In re F. H. McGraw & Co.*, 473 F.2d 465, 468 (C.A.3), *cert. denied*, 414 U.S. 1022, 94 S.Ct. 443, 38 L.Ed.2d 312 (1973); *Massachusetts Turnpike Auth. v. Perini Corp.*, 349 Mass. 448, 208 N.E.2d 807, 812 (1965); *Beal v. Stimpson Terminal Co.*, 1 Mass.App. 656, 305 N.E.2d 863, 865 (1974).

Consequently, the Court concludes that the Baker Stipulation was an operating agreement, did not concern divisions and, of course, did not supersede any previous agreements respecting divisions between Conrail and P&W for P&W's Old Stations [17]

---

**16.** The Court has already found the words are not ambiguous. The only ambiguity arises from the present disclosure of Eder's secret state of mind that the provision concerned divisions. However, his undisclosed and unex-

pressed state of mind during negotiations cannot be used to create an ambiguity now.

**17.** The parties agree that P&W is entitled with respect to P&W's Old Stations, to receive

nor did it establish any divisions between Conrail and P&W for P&W's New Stations acquired on April 1, 1976, for traffic coming from former Pennsylvania Railroad lines. (Tr. 109–110.) Because the parties have not agreed to divisions for P&W's New Stations, it is a matter for the ICC to determine if one of the parties petitions the ICC to decide the issue. Since it is exclusively the province of the ICC to set divisions, in the absence of agreement, this Court in this case is unable to award damages in the dispute between the parties involving P&W's New Stations. *Terminal Railroad Ass'n of St. Louis v. United States*, 266 U.S. 17, 30–31, 45 S.Ct. 5, 8, 69 L.Ed. 150 (1924); *Baltimore & Ohio Railroad Co. v. Alabama Great Southern Railroad Co.*, 506 F.2d 1265, 1269–70 (C.A.D.C.1974); *Backus-Brooks Co. v. Northern Pacific Railway Co.*, 21 F.2d 4, 15 (C.A.8), *cert. denied*, 275 U.S. 562, 48 S.Ct. 120, 72 L.Ed. 427 (1927). The Court, therefore, will limit itself to awarding damages for money owed for traffic on the Old Stations for which a divisions agreement exists.

## VII. MISROUTED AND DIVERTED TRAFFIC

P&W also contends in this case that Conrail has intentionally misrouted hundreds of carloads of freight since April 1, 1976, by sending shipments routed by the shippers "PC–Worc–B&M" or "CR–Worc–B&M"[18] to gateways or junctions[19] other than Worcester. P&W claims that it has a right to participate in revenues for shipments when routed as above even though P&W is not named by the shipper on the bill of lading.[20] P&W contends that this misrouting and diversion of traffic from the Worcester to other gateways constitutes a

breach of the 1976 Agreement.[21] It will be recalled that after the Penn Central merger and the inclusion of the New Haven railroad, prior to P&W resuming independent operations, only two railroads conducted freight operations and interchanged traffic at Worcester: Penn Central and the B&M. While one portion of the track at Worcester was owned jointly in one-third parts by B&M, P&W and N&W, and a second portion was owned jointly by P&W and N&W, Penn Central leased the P&W and N&W lines and thus achieved a direct interchange with B&M. When P&W resumed independent operations in 1973, Penn Central continued to interchange directly with B&M at Worcester by virtue of Penn Central's continuing lease and operation of the lines owned by N&W. However, on April 1, 1976, the date Conrail commenced its operations, P&W acquired exclusive control of a portion of the track formerly used by Penn Central to interchange with B&M at the Worcester gateway, and thereby severed the direct interchange between Conrail and B&M at Worcester. It is not disputed that, when Conrail lost Penn Central's direct interchange with B&M at Worcester, almost all shipments routed CR–Worc–B&M were interchanged directly between Conrail and B&M at Rotterdam Junction, Springfield and Boston. (D.I. 116, p. 57.) P&W contends that by publishing new routes and using those routes in order to directly interchange with B&M, Conrail violated the 1976 Agreement and deprived it of traffic to which it was entitled.

The Court finds no merit to these contentions. As the Court has already found in subdivision III above, the 1976 Agreement

---

100% of the divisions formerly earned by the New Haven on traffic originating exclusively on New York Central points and interchanged at Worcester under the 1973 Agreement. (D.I. 116, p. 46; D.I. 124, p. 67.)

**18.** For convenience both types of routings will be referred to as CR–Worc–B&M.

**19.** The two other gateways now used by Conrail are Rotterdam Junction and Springfield, Mass.

**20.** Conrail does not dispute the fact that if P&W is specifically named in the route by the

shipper, P&W is entitled to a division of the revenue and Conrail has offered to pay P&W the appropriate division for any instance in which P&W can show that it was named by the shipper but did not receive its line haul revenues. (D.I. 116, p. 54 n.34.)

**21.** P&W has abandoned its Seventh and Eighth Counterclaims because it no longer contends that the Baker Stipulation binds Conrail to route traffic to P&W (D.I. 124, p. 71 n. 79), and Eder so agreed. (Tr. 1272.)

did not obligate Conrail to refrain from establishing new routes, rates or divisions with other railroads, including B&M, or to refrain from using any such new routes, rates, or divisions after April 1, 1976. The 1976 Agreement does not address the issue of routing practices.

Finally, P&W appears to contend that Conrail breached its contracts with shippers by directly interchanging this traffic with B&M other than at Worcester when "Worc" appears in the bill of lading. To succeed on a theory of third-party beneficiary to the contract of carriage, P&W must demonstrate an intention to benefit P&W on the part of both parties to the carriage contract—the shipper and Conrail. *Martin Silverman v. Food Fair Stores, Inc.*, 407 Pa. 507, 180 A.2d 894, 895 (1962); *Spires v. Hanover Fire Ins. Co.*, 364 Pa. 52, 70 A.2d 828, 830 (1950). The evidence presented at trial certainly indicated that Conrail had no intention to benefit P&W by entering into contracts of carriage and there was no evidence presented to show that any shipper intended such a benefit.

Accordingly, the Court concludes that no misrouting occurred and that none has been proved.

## VIII. AMOUNTS WRONGFULLY WITHHELD BY P&W

 Pursuant to the 1976 Agreement, which the Court has found is valid and binding, was not induced by fraud and was not superseded by the Baker Stipulation, Conrail, in satisfaction of its obligation thereunder filed Freight Tariff No. 1, effective April 1, 1976, which adopted all joint routes, joint rates and divisions in effect between Penn Central and P&W. (Tr. 109, 119–20; PX 10, 10A–O.) As a consequence, the divisions for traffic originating or terminating on P&W's Old Stations are governed by the 1973 Agreement between Penn Central and P&W (PX 3), as amended by the 1974 and 1975 Agreements (PX 4 & 5).

The 1973 divisions agreement, as amended, in substance provides that for traffic terminating on P&W's lines, the applicable divisions are determined by the point of origin of the traffic as follows:

(1) On traffic originating on stations formerly served exclusively by the New York Central, P&W is entitled to 100% of the former New Haven's division with the NYC;

(2) On traffic originating on stations formerly served exclusively by the PRR, P&W is entitled to 45% of the former New Haven's division with the PRR;

(3) On traffic originating on stations formerly served by both PRR and NYC (common points), P&W is entitled to (a) 100% of the former New Haven's division with the NYC for traffic routed by the shipper via Worcester, and (b) 45% of the former New Haven's division with the PRR for traffic routed by the shipper via Greenville Piers, New Jersey and for traffic unrouted by the shipper. (Tr. 112–19; PX 3, 4, 5.)

(4) On traffic originating on stations formerly served by the Central of New Jersey, Erie Lackawanna, Lehigh Valley and Lehigh and Hudson River, P&W is entitled to 45% of the former New Haven division with those carriers. (PX 3.)

On much of the traffic originating on Conrail and terminating on P&W's Old Stations, P&W, as settling carrier, calculates divisions on a different basis than that set forth in the 1973 Agreement, as amended, and described above as numbers 2, 3 and 4. Basically, for the traffic in these two categories P&W has settled freight revenues by claiming 100% of the former New Haven's division. (Tr. 1019–20, 1026–28, 423–24, 132, 138–39, 256–61.) For each month that P&W has settled interline freight revenues on this basis, Conrail has issued statements of differences ("SD") claiming revenues based on a calculation of divisions as set forth in the 1973 Agreement, as amended. (Tr. 134–39; PX 198, 194, 192(1)–(8).) The total of these SD's through the account month of September, 1981, equals $7,088,-152.77. (Tr. 134, 139; PX 198, 194.) This figure then represents the amount due to Conrail over and above the amounts P&W concedes to be due when it calculates the revenue shares for traffic terminating on P&W's Old Stations.

Had normal practices been followed, Conrail would have already received the revenues P&W calculated as admittedly due Conrail and the $7,088,152.77 would represent an additional amount due Conrail by applying the proper division. Despite the fact that P&W calculates the amount due Conrail under its erroneous theory of the divisions agreements, it withholds *all* interline freight revenues—not merely the amounts in dispute here—as amounts allegedly due as a result of another separate dispute between the parties, not at issue in this case, involving the Providence Terminal Agreement ("PTA"). Consequently, the $7,088,152.77 represents the amount P&W must pay to Conrail even if P&W continues to withhold the undisputed revenues because of the PTA dispute.

However, this is not the total amount due Conrail. Just as Conrail issues SD's against P&W for shipments for which P&W is the settling carrier, P&W has issued SD's against Conrail for shipments for which Conrail is the settling carrier. (Tr. 1041–50.) Conrail calculates the divisions due P&W pursuant to the 1973 Agreement, as amended, and P&W contends it is entitled to divisions calculated according to its theory of the agreements. P&W's SD's represent the fact that P&W claims it is due an additional $1,094,791 for Old Stations traffic. (DX 244.) However, since the 1973 Agreement, as amended, governs divisions for Old Stations, the amount Conrail claims P&W owes it would be correct under normal settlement practices. But, P&W has taken a form of self-help remedy and offset the amount $910,250 which it claimed was due it as of December, 1980, against the undisputed revenues due Conrail which, as explained above, P&W is withholding. (Tr.

1047–48, 1063–64, 1066–68; DX 244.) Accordingly, since the Court has found the 1973 Agreement, as amended, governs divisions, P&W must pay Conrail an additional $910,250, the amount P&W offset to pay itself divisions to which this Court has found P&W was not entitled.

As previously stated, because the parties have not agreed to divisions for P&W's New Stations, the Court cannot resolve the dispute as to divisions for P&W's New Stations.

The Court will enter judgment in Conrail's favor and against P&W in its claims in Count I, increased by $910,250, representing the additional amounts wrongfully offset by P&W in December, 1980, together with interest and costs, calculated from the date payment was due. The Court will also direct P&W, for the period beginning with the account month of October 1981, to and continuing until a different bases is set by the ICC, to apply the divisional bases prescribed in the 1973 Agreement, as amended.

## IX. P&W'S COUNTERCLAIMS

Because the Court in its discussion above has found all of P&W's pleaded counterclaims to be without merit, judgment on these counterclaims will be entered in favor of Conrail against P&W.

Judgment will be entered in accordance with this opinion.[22]

---

**22.** In view of the determinations made above, the Court deems it unnecessary to pass upon Conrail's trust fund claim asserted in Count II of the complaint. Furthermore, the Court has found unnecessary to apply the doctrine of collateral estoppel against P&W arising from the prior litigation between the parties before the ICC (PX 1 & 2) and affirmed by the First Circuit in *Providence and Worcester Company v. Boston and Maine Corporation,* 666 F.2d 736 (C.A.1, 1981). In that litigation P&W was pur-

suing a different legal theory, nevertheless, many of the same underlying facts which were asserted there are presented here by P&W. However, in that litigation most of these basic facts were resolved against P&W. In any event, the Court finds it unnecessary to apply to the doctrine of collateral estoppel because the ultimate result reached in this case, even if the doctrine were applied, would remain unchanged.